**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HONOLULUTRAFFIC.COM; CLIFF
SLATER; BENJAMIN J. CAYETANO;
WALTER HEEN; HAWAII'S
THOUSAND FRIENDS; THE SMALL
BUSINESS HAWAII
ENTREPRENEURIAL EDUCATION
FOUNDATION; RANDALL W. ROTH;
MICHAEL UECHI, DR.; THE
OUTDOOR CIRCLE,
          *Plaintiffs-Appellants*,

v.

FEDERAL TRANSIT
ADMINISTRATION; LESLIE ROGERS,
in his official capacity as Federal
Transit Administration Regional
Administrator; PETER M. ROGOFF, in
his official capacity as Federal
Transit Administration
Administrator; U.S. DEPARTMENT OF
TRANSPORTATION; RAY LAHOOD, in
his official capacity as Secretary of
Transportation; THE CITY AND
COUNTY OF HONOLULU; WAYNE
YOSHIOKA, in his official capacity as
Director of the City and County of

No. 13-15277

D.C. No.
1:11-cv-00307-
AWT

OPINION

Honolulu Department of
Transportation,
*Defendants-Appellees*,

and

FAITH ACTION FOR COMMUNITY
EQUITY; THE PACIFIC RESOURCE
PARTNERSHIP; MELVIN UESATO,
*Intervenor-Defendants–Appellees*.

Appeal from the United States District Court
for the District of Hawaii
A. Wallace Tashima, Senior Circuit Judge, Presiding

Argued and Submitted
August 15, 2013—San Francisco, California

Filed February 18, 2014

Before: Mary M. Schroeder, Stephen Reinhardt,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Schroeder

# SUMMARY[*]

## National Environmental Policy Act / Jurisdiction

The panel affirmed the district court's dismissal of plaintiffs' claims under the National Environmental Policy Act and Section 4(f) of the Department of Transportation Act arising from litigation challenging the construction of a high-speed rail project in Honolulu, Hawaii.

The panel held that it had appellate jurisdiction under either 28 U.S.C. § 1292(a)(1), as an appeal from the grant or refusal of injunctive relief, or 28 U.S.C. § 1291, as an appeal of a final judgment. The panel also held that the Environmental Impact Statement's identification of the project objectives, and analysis of alternatives, satisfied the National Environmental Policy Act's requirements. The panel further held the defendants did not violate Section 4(f) of the Department of Transportation Act where the defendants did not adopt a Managed Lanes Alternative or bus rapid transit alternative, and where defendants made a good faith and reasonable effort to identify known archeological sites along the proposed project route and developed an appropriate plan for dealing with such sites that may be discovered during construction.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Nicholas C. Yost (argued) and Matthew G. Adams, Dentons US LLP, San Francisco, California, for Plaintiffs-Appellants.

Robert G. Dreher, Acting Assistant Attorney General, Brian C. Toth, David Glazer, and David C. Shilton (argued), Attorneys, Kathryn B. Thomson, Acting General Counsel, Paul M. Grier, Assistant General Counsel for Litigation, Peter J. Plocki, Deputy Assistant General Counsel for Litigation, United States Department of Justice, Washington, D.C.; Timothy H. Goodman, Senior Trial Attorney, United States Department of Transportation, Washington, D.C.; Dorval R. Carter, Jr., Chief Counsel, Nancy-Ellen Zusman, Assistant Chief Counsel, Joonsik Maing and Renee Marler, Attorney-Advisors, Federal Transit Administration, Washington, D.C., for Defendants-Appellees Federal Transit Administration, et al.

Robert D. Thornton (argued), Special Deputy Corporation Counsel, City and County of Honolulu, Nossaman LLP, Irvine, California; Edward V.A. Kussy, Special Deputy Corporation Counsel, City and County of Honolulu, Nossaman LLP, Washington, D.C.; John P. Manaut and Lindsay N. McAneeley, Special Deputies Corporation Counsel, City and County of Honolulu, Carlsmith Ball LLP, Honolulu, Hawaii; Donna Y.L. Leong and Don S. Kitaoka, Deputy Corporation Counsel, City and County of Honolulu, Honolulu, Hawaii, for Defendants-Appellees The City and County of Honolulu and Michael Formby.

William Meheula (argued), Meheula & Devens LLP, Honolulu, Hawaii, for Intervenors-Defendants-Appellees.

Elizabeth S. Merritt, Deputy General Counsel, National Trust for Historic Preservation, Washington, D.C., for Amicus Curiae National Trust for Historic Preservation.

## OPINION

SCHROEDER, Circuit Judge:

## I.  INTRODUCTION

This litigation represents a challenge to the construction of a 20-mile, high-speed rail system (the "Project") from the western portion of Oahu through the downtown area of Honolulu, Hawaii.  Honolulu has been unsuccessfully struggling to cope with traffic congestion since the mid-1960s.  That was when Congress passed the Urban Mass Transportation Act of 1964, later amended in the Federal-Aid Highway Act of 1978, which mandated the creation of Metropolitan Planning boards to develop long-range plans for efficient public transportation.  *See* 49 U.S.C. §§ 5303 and 5304.  Honolulu is now reportedly the second-most congested metropolitan area in the nation.  Courtney Subramanian, *Top 10 U.S. Cities with the Worst Traffic*, Time (May 7, 2013), newsfeed.time.com/2013/05/07/top-10-u-s-cities-with-the-worst-traffic/.

In earlier decades, Honolulu developed plans for a rail system and later for a bus system that never came to fruition. Its efforts are documented in the Environmental Impact Statement ("EIS") that was prepared for the project we deal with in this case.  A survey in 2004 showed broad public support for the concept of a rail system, and in 2005 the Legislature provided the funding mechanism for such a

system. The construction of an elevated, high-capacity rail system from the University of Hawaii campus at Manoa, through downtown Honolulu, to an agricultural area known as Kapolei is now underway.

Plaintiffs are a consortium of interest groups and individuals opposing the Project. They filed the action in 2011 against the Federal Transit Administration ("FTA"), the U.S. Department of Transportation ("DOT"), the City and County of Honolulu, and various federal and local administrators. Plaintiffs raise challenges under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470 to 470x-6, and Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303. The litigation reflects the controversies that continue over the method and route of mass transit on Oahu.

The district court granted summary judgment to Defendants on the NEPA claims, the NHPA claims, and all but three of the Section 4(f) claims, thereby permitting construction to continue on the first three phases. Plaintiffs appeal. In addition, the court enjoined construction of the fourth phase of the Project pending a remand to the agency on the remaining Section 4(f) claims. There is no appeal with respect to Phase 4.

We first deal with Defendants' objection to appellate jurisdiction, and we then affirm on the merits.

## II. BACKGROUND

Federal law requires long-range planning for a federally funded transportation system in order to identify local purposes and stating federal objectives.

On December 7, 2005, the FTA published its Notice of Intent ("2005 NOI") to prepare an EIS and Alternatives Analysis ("AA") for transit service in Oahu's corridor linking Kapolei with Waikiki and the University of Hawaii campus at Manoa. An AA is required for federal funding under the Department of Transportation's New Starts Program. *See* 49 U.S.C. § 5309. The AA process proceeded in three steps.

First, on October 24, 2006, the City prepared an "Alternatives Screening Memo" identifying the Project's purpose and need as providing improved mobility in the highly congested east-west transportation corridor; providing faster, more reliable public transportation services in the corridor than those currently operating in mixed-flow traffic; providing an alternative to private automobile travel; improving mobility for travelers; improving transportation system reliability; and improving transportation equity for all travelers. It identified several alternatives to consider for meeting the City's objectives, including No Build, a Fixed Guideway alternative (public transportation using a separate right-of-way), Transportation Systems Management (improvements to the existing transportation system, including optimizing bus service), and a Managed Lanes Alternative ("MLA") (a new roadway for buses and other high-occupancy vehicles), and several others.

Second, the City prepared an Alternatives Analysis Report for the Honolulu City Council. That report evaluated

the alternatives that had survived the City's screening process, concluding that the Transportation Systems Management alternative would not offer community or environmental benefits. It also identified several concerns with the MLA, including the possibility of congestion on local roadways near entrances and exits to managed lanes, project costs and eligibility for federal funding, and integration of managed lanes with transit service. The Report concluded that the Fixed Guideway alternative was the most effective alternative in accommodating longer corridor transit trips and increased work commutes, reducing travel time, and consuming the least energy.

Third, the City Council formed a "Transit Advisory Task Force" to "review the AA and [] make findings and recommendations to assist the Council in the selection of a Locally Preferred Alternative." 49 U.S.C. § 5309(d)(2)(A)(i) (requiring selection of a locally preferred alternative pursuant to NEPA). The City Council passed an ordinance in January 2007 selecting an elevated Fixed Guideway system as its preferred alternative, stating that "a fixed guideway system is the best selection for the long-term needs and demands of our growing island population."

On March 15, 2007, the FTA published a Notice of Intent to prepare an EIS ("2007 NOI"). The NOI requested public comment on five possible transit technologies: light rail, rapid rail (steel-wheel-on-steel-rail), rubber-tire guided, magnetic levitation, and monorail. Experts appointed by the City Council reviewed responses to that request, as well as twelve responses from transit vehicle manufacturers, and selected steel-wheel-on-steel-rail as the technology for the Project. Honolulu voters subsequently approved a City Charter Amendment establishing such a system.

The City and the FTA then prepared a draft EIS and a final EIS ("FEIS").  The FEIS evaluated a No Build option and three development alternatives, including a Fixed Guideway option from Ala Moana Center to Kapolei via the airport, that was ultimately selected as the preferred alternative.  The FEIS stated that other alternatives had been eliminated because Fixed Guideway best met the Project's purpose and need and because the City Council had selected it as the locally preferred alternative pursuant to 49 U.S.C. § 5309(d)(2)(A)(i).

The Project's proposed route would bring it close to several historic sites.  The Project thus implicated Section 4(f) of the Department of Transportation Act, which requires that the use of land of a historic site may be approved only if "(1) there is no prudent and feasible alternative to using the land;" and (2) the project includes "all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use." 49 U.S.C. § 303(c).  "Use" is construed broadly, applying not only to areas physically taken, but also to those "significantly, adversely affected by the project." *Adler v. Lewis*, 675 F.2d 1085, 1092 (9th Cir. 1982).

The draft EIS for the Project had been subject to a public review period that engendered many comments concerning both the chosen system and the impact on historic sites.  The FEIS analyzed more than 40 historic sites as potentially affected.  Because the MLA would have had a lesser impact on historic sites than the alternative chosen for the Project, numerous commenters objected to the FEIS's rejection of the MLA.

The FEIS's final "Section 4(f) Evaluation," relating to historic sites, concluded that most of the sites would not be used or would be subject only to de minimis use. Specifically, the FEIS concluded that the Project would use the Chinatown Historic District and the historic Dillingham Transportation Building, because stations would be constructed on those properties, but would not use Mother Waldron Park because the proximity of the Project route to that site would not directly affect its design or public use.

On January 18, 2011, the FTA issued a Record of Decision ("ROD") approving the Project. The ROD included a finding that there is no feasible and prudent alternative to the Project's use of the Chinatown Historic District and the Dillingham Transportation Building. The ROD also found that the MLA failed to meet the Project's "Purpose and Need" because it would not support forecasted population and employment growth and would provide little transit benefit at a high cost.

Plaintiffs filed this action on May 12, 2011, seeking to enjoin construction on the ground that the FEIS and the ROD approving the Project did not comply with the requirements of NEPA, Section 4(f), and the regulations implementing those statutes. After the parties filed cross-motions for summary judgment, the district court in November 2012 issued an order dismissing all of the NEPA and NHPA claims.

As to the Section 4(f) claims, the district court granted summary judgment for Plaintiffs on three, ruling injunctive relief was appropriate. The Project includes four phases, defined geographically. The three Section 4(f) claims on which Plaintiffs prevailed affect only Phase 4. The court held

that Defendants had failed to complete reasonable efforts to identify above-ground Traditional Cultural Properties ("TCPs") prior to issuing the ROD. The court also held that Defendants had failed adequately to consider the Beretania Street Tunnel alternative prior to eliminating it as imprudent, and that Defendants had failed adequately to consider whether the Project will constructively use Mother Waldron Park.

After holding a hearing on the appropriate remedy for the Section 4(f) claims, the district court issued its judgment, which it described as its "final Judgment, which shall include partial injunctive relief," on December 27, 2012. The judgment incorporated the prior orders granting summary judgment to Defendants on all the NEPA and NHPA and most of the Section 4(f) claims, and to Plaintiffs on three of the Section 4(f) claims. The court enjoined construction of Phase 4 pending remand of the three Section 4(f) claims to the FTA. The court instructed the agency to "complete their identification of above ground TCPs within the corridor, reconsider their no-use determination for Mother Waldron Park . . . " and "fully consider the prudence and feasibility of the Beretania tunnel alternative . . . ."[1]

---

[1] The order provided in full as follows:

After briefing, hearing, and disposition of this case on the merits, *see HonoluluTraffic.com v. Fed. Transit Admin.*, 2012 WL 1805484 (D. Hawaii 2012) (partial grant of summary judgment); Order on Cross-Motions for Summary Judgment, filed Nov. 1, 2012 ("Summary Judgment Order"), the parties and the court addressed the appropriate remedy. The parties submitted additional briefing on the scope of any remedies, including any equitable relief. The remedy phase was

fully argued and heard on December 12, 2012. After due consideration of those arguments, briefs, and the record, the court now enters its final Judgment, which shall include partial injunctive relief, as set forth below.

As reflected in its prior orders, the court granted summary judgment to Plaintiffs on three of their § 4(f) claims – claims arising under § 4(f) of the Department of Transportation Act, 49 U.S.C. § 303. The court granted summary judgment to Defendants on all other claims raised by Plaintiffs, which include Plaintiffs' remaining § 4(f) claims, all claim[s] arising under the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, and all claims arising under § 106 of the National Historic Preservation Act, 16 U.S.C. § 470f. In entering its partial permanent injunction, the court has considered the well-recognized equitable factors that apply, *see, e.g.*, *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2756 (2010), and finds that, to the extent Defendants['] actions are enjoined, the four-factor test, on balance favors Plaintiffs, including: (1) irreparable injury[;] (2) the inadequacy of monetary relief; (3) the balance of hardships; and (4) the public interest.

**IT IS, THEREFORE, ADJUDGED** that this matter is remanded to the Federal Transit Administration, but without vacatur of the Record of Decision, to comply with the court's Summary Judgment Order.

**DEFENDANTS,** their officers, agents, servants, employees, and attorneys; and all other persons who are in active concert or participation with them, are hereby restrained and enjoined from conducting any construction activities and real estate acquisition activities in Phase 4 of the Honolulu High-Capacity Transit Corridor Project (the "Rail Project"). This injunction on Phase 4 construction activities shall

Since the district court granted summary judgment to Plaintiffs on three of the claims affecting Phase 4, and granted Plaintiffs' request to enjoin construction of that phase pending further agency proceedings, Plaintiffs do not appeal the injunction. There is no cross-appeal. Phase 4 is thus not involved here.

---

terminate 30 days after Defendant Federal Transit Administration files with the court notice of Defendants' compliance with the Summary Judgment Order and evidence of such compliance, unless Plaintiffs file an objection within said 30-day period specifying how the Federal Transit Administration has failed to comply with the Summary Judgment Order. If such objection is timely filed, this injunction shall remain in effect pending the court's resolution of Plaintiffs' objection(s).

This injunction shall not prohibit, and Defendants may prepare, Phase 4 engineering and design plans, conduct geotechnical training, and conduct other preconstruction activities, including any activities that are appropriate to complete the additional analysis required by the Summary Judgment Order. This injunction shall not apply to Phases 1 through 3 of the Rail Project.

Within 150–180 days of the issuance of this Judgment, and every 90 days thereafter, Defendants shall file a status report setting forth the status of Defendants' compliance efforts with the terms of the Summary Judgment Order. Either by stipulation of all parties or upon noticed motion, Defendants may apply to except any activity otherwise prohibited by this injunction from its terms.

In the exercise of its discretion, the court determined that each party shall bear its own costs.

Plaintiffs timely appeal the dismissal of the remainder of their claims.  Plaintiffs contend that the district court should not have dismissed the NEPA claims, or Plaintiffs' other Section 4(f) claims.

Defendants have filed a motion to dismiss for lack of appellate jurisdiction, arguing that the judgment was not an appealable final order.

We consider the jurisdictional issue first.

## III.   DISCUSSION

### A.  Jurisdiction

Defendants challenge our appellate jurisdiction, contending that the judgment is not appealable as a final judgment under 28 U.S.C. § 1291 (authorizing appeals as of right from district court judgments).  Defendants argue that the statute does not apply because the judgment not only granted summary judgment for the government on the bulk of the claims that Plaintiffs now appeal, but also granted summary judgment for Plaintiffs on three Section 4(f) claims and enjoined Phase 4 of construction pending reconsideration of the claims by the agency on remand.  A remand does not finally dispose of a claim, but ordinarily does confer appellate jurisdiction for purposes of a government appeal.  *See Alsea Valley Alliance v. Dep't of Commerce*, 358 F.3d 1181, 1184–86 (9th Cir. 2004).

Here, Defendants could have appealed the remand order but did not.  Plaintiffs are not even aggrieved by it.  Since no party wants us to review the remand of the Section 4(f) claims, the remand should not defeat our jurisdiction to

review the unquestionably final dismissal of the remainder of the claims. We have said that the final judgment rule "deals in practice, not theory." *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1175 (9th Cir. 2011). As a practical matter, the work of the district court as to the dismissed claims is complete, and review of those claims is appropriate under § 1291.

Moreover, even if the judgment were not appealable as a matter of finality, it would be reviewable under § 1292(a)(1) as an appeal from the grant or refusal of injunctive relief. Indeed, this litigation has always been about injunctive relief, i.e., stopping construction of the rail system. This is apparent when we look back on the nature of the underlying dispute and the district court's resolution of it. When Plaintiffs initiated litigation in 2011, their complaint in its title said it sought "injunctive and declaratory relief." In the body of the complaint, Plaintiffs requested injunctive relief requiring Defendants to halt progress on the Project, withdraw the ROD, and withhold re-approval until the requirements of NEPA and Section 4(f) had been met and all reasonable alternatives had been considered. The district court's entry of summary judgment in favor of Defendants on the NEPA claims thus denied Plaintiffs' request for injunctive relief on all of the dismissed claims.

Defendants' jurisdictional argument concerns the lack of technical finality of the order under § 1291. The argument does not mention § 1292(a)(1), which Plaintiffs correctly point out is an alternative basis for appellate jurisdiction in this case. Work on the rail system is going forward and the issues need to be resolved. Since all of Plaintiffs' claims were for injunctive relief, we have appellate jurisdiction under § 1292(a)(1). We hold that we have jurisdiction under

either § 1292(a)(1) or § 1291 (or both).  We therefore turn to
the merits of Plaintiffs' claims.

### B.  NEPA Claims

Plaintiffs' challenges under NEPA are directed principally
to the choice of the steel-wheel-on-steel-rail Fixed Guideway
system.  Plaintiffs contend that the district court erred in
granting summary judgment on their NEPA claims because
Defendants (1) unreasonably restricted the Project's purpose
and need, and (2) did not consider all reasonable alternatives
as required under that Act and its regulations.

An EIS must state the underlying purpose and need for
the proposed action.  *See* 40 C.F.R. § 1502.13.  Courts
evaluate an agency's statement of purpose under a
reasonableness standard, *id.*, and in assessing reasonableness,
must consider the statutory context of the federal action at
issue, *see League of Wilderness Defenders v. U.S. Forest
Serv.*, 689 F.3d 1060, 1070 (9th Cir. 2012).  Agencies enjoy
"considerable discretion" in defining the purpose and need of
a project, but they may not define the project's objectives in
terms so "unreasonably narrow," that only one alternative
would accomplish the goals of the project.  *Nat'l Parks &
Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058,
1070 (9th Cir. 2010).  The EIS would then become merely a
foreordained formality.  *Id.*  Plaintiffs claim the EIS
objectives were too narrow.

The FEIS describes the Project's purpose as follows:
(1) "to provide high-capacity rapid transit in the highly
congested east-west transportation corridor between Kapolei
and University of Hawaii Manoa;" (2) "to provide faster,
more reliable public transportation service in the study

corridor than can be achieved with buses operating in congested mixed-flow traffic;" (3) "to provide reliable mobility in areas of the study corridor where people of limited income and an aging population live;" (4) "to serve rapidly developing areas of the study corridor;" and (5) to "provide additional transit capacity [and] an alternative to private automobile travel, and [to] improve transit links within the study corridor."  It describes the need for transit improvements as follows: (1) "Improve corridor mobility;" (2) "Improve corridor travel reliability;" (3) "Improve access to planned development to support City policy to develop a second urban center;" and (4) "Improve transportation equity."

The purpose was defined in accordance with the statutorily mandated formulation of the transportation plan that preceded the FEIS.  That plan was the 2004 Oahu Metropolitan Planning Organization, Regional Transportation Plan ("2004 ORTP").  The stated objectives comply with the intent of the relevant federal statutes.  Specifically, the Safe Accountable Flexible Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU") provides that a federally-funded transportation plan's purposes may include "achieving a transportation objective identified in an applicable . . . metropolitan transportation plan."  *See* 23 U.S.C. § 139(f)(3).  The 2004 ORTP had concluded that a high-capacity, high-speed transit project connecting west Oahu with downtown Honolulu was necessary to implement Oahu's land use policies.  It also identified a Fixed Guideway system as a central component of that plan.  Moreover, the statute authorizing the federal New Starts transportation program states that it is in the interest of the United States to foster transportation systems that maximize safe, secure, and efficient mobility of individuals, minimize environmental

impacts, and minimize fuel consumption, 49 U.S.C. § 5301(a), and that one of the purposes of the program is to provide financial assistance to state and local governments in order to improve mobility for elderly and economically disadvantaged individuals, 49 U.S.C. § 5301(f)(4). The Project's stated objectives are consistent with all these purposes.

Viewed in its statutory context, the Project's objectives are not so narrowly defined that only one alternative would accomplish them. The statement of purpose and need is broad enough to allow the agency to assess various routing options and technologies for a high-capacity, high-speed transit project. The district court therefore properly concluded that it is reasonable, stating: "Because the statement of purpose and need did not foreclose all alternatives, and because it was shaped by federal legislative purposes, it was reasonable."

NEPA also requires an EIS to discuss, among other things, alternatives to the proposed action. 42 U.S.C. § 4332(2)(C). The range of alternatives that an EIS must consider is "dictated by the nature and scope of the proposed action." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1025, 1038 (9th Cir. 2008). "Judicial review of the range of alternatives considered by an agency is governed by a 'rule of reason' that requires an agency to set forth only those alternatives necessary to permit a 'reasoned choice.'" *State of Cal. v. Block*, 690 F.2d 753, 767 (9th Cir. 1982). "An agency is under no obligation to consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives." *Seattle*

*Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996).

Plaintiffs contend that the EIS did not properly consider all reasonable alternatives and should have considered alternatives the state had earlier rejected. In this case, the EIS did not expressly consider alternatives that had earlier been ruled out in the screening process conducted by the state. Plaintiffs therefore argue that the City and the FTA improperly relied on the AA process to exclude certain alternatives such as the MLA and light rail from detailed consideration.

We have held, however, that an agency does not violate NEPA by refusing to discuss alternatives already rejected in prior state studies. *Laguna Greebelt, Inc. v. Dep't of Transp.*, 42 F.3d 517, 524, n.6 (9th Cir. 1994). Under applicable federal regulations, a state-prepared AA may be used as part of the NEPA process as long as it meets certain requirements, including that (1) the federal lead agency furnished guidance in the AA's preparation and independently evaluated the document, 23 U.S.C. § 139(c)(3), and (2) the AA was conducted with public review and a reasonable opportunity to comment, 23 C.F.R. § 450.318(b)(2)(ii)–(iii).

The City prepared the AA with the benefit of public comment and federal guidance. The district court cited evidence in the record that the FTA furnished guidance during the AA's preparation and independently evaluated it, including letters between the City and the FTA about funding for alternatives considered in the AA, the ROD's approval of the AA, internal FTA discussions about AA logistics, and the FTA's indication that it would review the AA prior to publication. The district court also pointed to the many

opportunities for public comment that generated over 3,000 comments from the public on the AA before the City selected the locally preferred alternative. The district court properly concluded that Defendants did not err in relying on the AA prepared by the state to help identify reasonable alternatives as part of the NEPA process.

Plaintiffs' real quarrel with the process is that it failed to consider Plaintiffs' proposed three-lane MLA alternative. The MLA alternative proposed construction of lanes dedicated for use by buses, high-occupancy vehicles, and toll-paying single-occupant vehicles, managed to maintain free-flowing speeds between Waiawa Interchange and Iwilei. Variations of the alternative included a two-lane plan versus a three-lane plan, and reversible lanes to allow higher capacity during peak hours. The Defendants did consider a two-lane alternative that the FEIS specifically addressed and rejected for cost reasons. The three-lane MLA plan would have been even more costly. The district court determined that the estimates in the AA analysis were reasonable, and the Director of the City and County of Honolulu's Department of Transportation Services specifically stated that the three-lane alternative would increase costs.

Plaintiffs contend on appeal, as they did before the district court, that Defendants should have used a Tampa, Florida project for purposes of cost comparison, and should not have assumed that the MLA would be ineligible for federal funding. However, the City Council's Transit Advisory Task Force had concluded that the AA's cost estimates were "fairly and consistently prepared, and that they may be used for both planning and cost comparisons," and that the Tampa project was not a good cost comparator because of the many

differences between the two projects. The district court correctly ruled this was not unreasonable.

Plaintiffs finally maintain that Defendants arbitrarily and capriciously excluded the light-rail alternative from the EIS. Here too, Defendants properly relied on the AA process to eliminate alternatives, including corridor-wide light rail and light rail in the downtown portions of the corridor. The FEIS explained that those alternatives lacked feasability and desired capacity:

> Corridor-wide at-grade light-rail transit was rejected because it would have required conversion of traffic lanes to rail throughout the corridor, thereby substantially reducing roadway capacity since no abandoned or undeveloped alignments are available in the study corridor. At-grade light-rail would have required either the acquisition and removal of buildings throughout the corridor or the conversion of two or more traffic lanes.

The EIS's identification of the project objectives and analysis of alternatives satisfied NEPA's requirements.

## C. The Dismissed Section 4(f) Claims

The Department of Transportation Act is intended to preserve historic sites as far as practicable. Section 4(f) allows a federal project "requiring the use of land of an historic site" to be approved only if "(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl

refuge, or historic site resulting from the use." 49 U.S.C. § 303(c). An alternative is not prudent if, among other things, it "compromises the project to a degree that it is unreasonable to proceed with the project in light of its stated purpose and need." 23 C.F.R. § 774.17.

Plaintiffs contend that the FTA's approval of the Project violated Section 4(f) by (1) failing to adopt the MLA or bus rapid transit alternative in order to avoid the use of historic sites; and (2) failing fully to identify and evaluate Native Hawaiian burial sites before approving the Project.

Defendants concluded that the MLA and bus rapid transit alternatives were not prudent because they did not meet the Project's stated purpose and need. The record supports the reasonableness of that conclusion. The MLA failed to meet the purposes of the Project because, according to the City and FTA's expert analysis, it would actually increase transit times, would not improve corridor mobility or travel reliability, and would not reduce congestion, support planned concentrations of future population and employment growth, or substantially improve service or access to transit for transit-dependent communities. Buses would still have to operate in mixed traffic, and would not alleviate roadway congestion. Moreover, there was no identified funding source for bus rapid transit.

Plaintiffs point to a study showing that the MLA would reduce drive times even for people who never used the lanes. They contend that Defendants acted arbitrarily and capriciously by ignoring that evidence. That evidence, however, was contrary to the studies by the government. The FTA is entitled to rely on the opinions of its own experts, and

thus its decision was not arbitrary or capricious. *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

The FTA was not required to further document its determination that the MLA and bus rapid transit alternatives were imprudent. It did not have to make explicit findings as to all the data presented. Section 4(f) itself does not require any formal findings, and the implementing regulations require only "sufficient supporting documentation to demonstrate why there is no feasible and prudent avoidance alternative." *See* 23 C.F.R. § 774.7; *see also Adler v. Lewis*, 675 F.2d 1085, 1095 (9th Cir. 1982) (disregarding possible technical deficiencies in a Section 4(f) evaluation because "[w]hether or not the reports and studies use the 'magic' terminology, there has been a reasonable and thorough review"); *Hickory Neighborhood Def. League v. Skinner*, 920 F.2d 159, 163 (4th Cir. 1990) (holding that the rejection of an alternative as imprudent was amply supported by the record, even though it was not expressly stated). The FTA was entitled to rely on the findings and studies that preceded the decision to construct the Project.

Plaintiffs also contend that Defendants should have completed their Section 4(f) identification and evaluation of Native Hawaiian burial sites before approving the Project. Federal regulations require that Section 4(f) property be identified and evaluated for potential use "as early as practicable in the development of the action when alternatives to the proposed action are under study." 23 C.F.R. § 774.9(a). Sites are identified as eligible so long as they are included in, or eligible for inclusion in the National Register of Historic Places. *See* C.F.R. §§ 774.11(f), 774.17. The process for identifying historic sites for the National Register is outlined in Section 106 of the National Historic

Preservation Act. 16 U.S.C. § 470f ("Section 106"). Section 106 requires the agency official to "make a reasonable and good faith effort to carry out appropriate identification efforts." 36 C.F.R. § 800.4(b)(1).

Plaintiffs argue that Defendants' failure to completely identify all Section 4(f) sites prior to approval of the Project constituted an improper "phased" approach to the required identification and evaluation. *See N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147 (9th Cir. 2008) (finding a violation of Section 4(f) where an agency approved a project when analysis had only been conducted for one of the project's four phases and the remaining phases would be analyzed only after the project had begun). In this case, Defendants did not conduct Archaeological Inventory Surveys ("AIS") to identify undiscovered burial sites along the entire twenty-mile length of the Project prior to its approval, even though it is likely that construction may disturb some of such sites.

Yet there was a good reason for Defendants' reluctance to conduct the surveys. The exact route and placement of the support columns had not yet been determined, and the surveys themselves were likely to disturb burial sites. Any changes to the plans would then result in repetition of the surveys and more disturbance to burial sites than would otherwise be necessary. Instead, Defendants commissioned an Archeological Resources Technical Report, which used soil survey data, archeological records, land survey maps, and field observations to identify unknown burial sites and predict the likelihood of finding additional burial sites during different phases of the Project. Additionally, Defendants entered into a programmatic agreement with the State Historic Preservation Officer, the Advisory Council on

Historic Preservation, and other federal entities outlining the procedures for burial sites that are discovered during construction, including requiring archaeological inventory surveys prior to the final engineering and design phase of the Project and providing specific protocols for addressing burials or other archaeological resources that are discovered. *See* 73 Fed. Reg. 13368–01, 13379–80 (2008) (recommending such an agreement as "appropriate and desirable").

Burial sites are eligible for Section 4(f) protection only insofar as they are identified under the Section 106 process for identifying historic sites. Defendants need only "make a reasonable and good faith effort" to identify those sites as required by Section 106. 36 C.F.R. § 800.4(b)(1); *See also N. Idaho Cmty. Action Network*, 545 F.3d at 1159 (noting that a Section 4(f) evaluation necessarily requires the agency to follow the Section 106 identification process); *City of Alexandria v. Slater*, 198 F.3d 862, 871 (D.C. Cir. 1999) (noting that a Section 4(f) evaluation is predicated on completion of a Section 106 identification process). Defendants have made a good faith and reasonable effort to identify known archaeological sites along the proposed Project route and have developed an appropriate plan for dealing with sites that may be discovered during construction. Defendants have not violated Section 4(f).

## CONCLUSION

The judgment of the district court dismissing Plaintiffs' NEPA and Section 4(f) claims is **AFFIRMED**.