**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

EARTH ISLAND INSTITUTE;
CENTER FOR BIOLOGICAL
DIVERSITY,

          *Plaintiffs-Appellants*,

  v.

UNITED STATES FOREST
SERVICE; MARGIE B. DEROSE,

          *Defendants-Appellees*.

No. 22-16751

D.C. No.
2:19-cv-01271-
MCE-DB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, Jr., District Judge, Presiding

Argued and Submitted October 17, 2023
San Francisco, California

Filed December 7, 2023

Before: Eugene E. Siler,[*] Jacqueline H. Nguyen, and Ryan
D. Nelson, Circuit Judges.

Opinion by Judge Siler

---

[*] The Honorable Eugene E. Siler, United States Circuit Judge for the U.S.
Court of Appeals for the Sixth Circuit, sitting by designation.

# SUMMARY[**]

## Environmental Law

The panel affirmed the district court's summary judgment in favor of the U.S. Forest Service in an action challenging the Service's approval of the Three Creeks Project.

Plaintiffs alleged that the Service failed to adequately consider alternatives to logging, failed to solicit public comments following its 2018 Environmental Assessment, and failed to supplement its National Environmental Policy Act (NEPA) analysis following a 2020 bark-beetle outbreak and the subsequent Inyo Craters Bark Beetle Hazard Tree Abatement Project.

The panel held that plaintiff had not shown that the Service's approval of the Three Creeks Project was arbitrary, capricious, or otherwise unlawful. The Service considered a reasonable range of alternatives, offered the public a reasonable opportunity to comment, and was not required to conduct further NEPA analysis following the bark-beetle outbreak. The panel held that because plaintiff failed to raise its proposed alternatives during the comment period, it failed to exhaust its argument, and the panel need not reach the merits of the suggested alternatives.

Since plaintiff did not include its claim regarding the Inyo Craters Project in its amended complaint, the panel did not consider it. Because the Service acted in accordance

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

with its own regulations, NEPA, and the Administrative Procedures Act, the panel affirmed the summary judgment in the Service's favor.

## COUNSEL

Thomas C. Buchele (argued) and Andrew B. Baloga, Certified Law Student, Earthrise Law Center, Lewis & Clark Law School, Portland, Oregon, for Plaintiffs-Appellants.

Ezekiel A. Peterson (argued), Rachel Heron, and Robert P. Stockman, Attorneys, Environment and Natural Resources Division; Sean C. Duffy, Trial Attorney, Natural Resources Section; Rita Ahuja, Attorney, Office of the General Counsel, United States Department of Agriculture; Rebecca J. Jaffe, Attorney, Environmental Enforcement Section; Todd Kim, Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Defendants-Appellees.

# OPINION

SILER, Circuit Judge:

The Inyo National Forest ("the Forest") looks much different now than it did in the nineteenth century. Large, mature trees once dotted the landscape. But decades of logging, fire suppression, and drought rendered the forest dense with thin, immature trees. Conditions became ripe for catastrophic forest fires, bark-beetle infestations, and fungal infections.

The U.S. Forest Service ("the Service") sought to address this problem by approving the Three Creeks Project. Plaintiff-Appellant Earth Island Institute and the Center for Biological Diversity ("Earth Island") disagrees with the Service's methods. It alleges that in approving the project, the Service violated the National Environmental Policy Act ("NEPA"), the Service's Objection Regulations, and the Administrative Procedure Act ("APA"). Broadly, Earth Island challenges the Three Creeks Project's logging component. Specifically, Earth Island contends that the Service failed to adequately consider alternatives to logging, failed to solicit public comments following its 2018 Environmental Assessment (EA), and failed to supplement its NEPA analysis following the 2020 bark-beetle outbreak and subsequent Inyo Craters Project. The district court granted the Service's motion for summary judgment. Earth Island appeals.

After careful consideration, we affirm. Earth Island has not shown that the Service's approval of the Three Creeks Project is arbitrary, capricious, or otherwise unlawful. The Service considered a reasonable range of alternatives, offered the public a reasonable opportunity to comment, and

was not required to conduct further NEPA analysis following the bark-beetle outbreak. And since Earth Island failed to include its claim regarding the Inyo Craters Project in its amended complaint, we will not consider it here. Because the Service acted in accordance with its own regulations, NEPA, and the APA, we affirm the district court's grant of summary judgment in the Service's favor.

## I. Facts and Procedural History

The Service initiated environmental analysis for the Three Creeks Project in 2012 with a scoping notice. It intended for the Three Creeks Project to return the Forest to its resilient, pre-European settlement conditions by thinning excess trees, removing excess fire fuel, and using prescribed fire. Earth Island submitted scoping comments questioning the project's necessity, objecting to its underlying science, and requesting its withdrawal.

In March 2016, the Service published a draft Environmental Assessment ("2016 EA").[1] The 2016 EA described the Three Creeks Project area as greatly at risk of high-intensity fires. It explained that action is needed to open the forest to its pre-European settlement conditions, where the horizon was open and park-like, scattered with a random distribution of age-diverse trees, but dominated by

---

[1] NEPA requires agencies to analyze a project's environmental impacts before approving it. 42 U.S.C. §§ 4321 et seq. Agencies publish EAs to determine whether a project will significantly affect the environment. 40 C.F.R. § 1501.4 (2020); *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994). If an EA raises "substantial questions" as to whether a project "may cause significant degradation of some human environmental factor," the agency prepares a more complicated Environmental Impact Statement (EIS). *LaFlamme v. FERC,* 852 F.2d 389, 397 (9th Cir. 1988) (emphasis added). Otherwise, the agency issues a Finding of No Significant Impact (FONSI).

older, larger trees.   Under such conditions, fires burned frequently but not intensely, and rarely catastrophically.  The Service contemplated two alternatives to reach this goal: action or no action.

In its action alternative, the Service analyzed the potential use of commercial thinning, prescribed fire, and fuel treatment (removing potential fire fuel, like downed trees) to restore the project area of the Forest to pre-settlement conditions.   The project area was to comprise 10,187 acres of the Forest's approximately two million total acres.  Those 10,187 acres were to be divided unequally into 138 units.   Some units would receive special treatment in order to protect wildlife, plants, and other resources.   For example, three units already containing high-quality Pacific marten habitat were to be designated as "marten units," in which the forest treatment would be curtailed to preserve the marten's preferred habitat.   In its no action alternative, the Service analyzed the potential of proceeding with current forest management.

Earth Island submitted extensive comments requesting withdrawal of the 2016 EA and its larger framework.   It again questioned the project's necessity and underlying science.   It also expressed concern for the project's impact on certain species.   It did not, however, request consideration of alternative action.   While Earth Island criticized forest thinning as "largely irrelevant" to combatting fire intensity and spread, it did not distinguish between the thinning of large or small trees.  Nor did it endorse the use of prescribed or wildland fires, which it declared largely ineffectual on future fire behavior.

In July 2017, the Service published a revised Environmental Assessment ("2017 EA").   The Service

removed eight units—around 600 total acres—from the Three Creeks Project after they were destroyed by fires.  The project size decreased to 9,590 acres divided into 130 unequal units.  Otherwise, the 2017 EA remained essentially the same as the 2016 EA.

During the 2017 objection process, Earth Island sent the Service a four-page letter requesting the Three Creeks Project be halted or, "[a]t a minimum, the [p]roject's logging units . . . be converted into prescribed burning units (with no pre-fire thinning/logging)[.]"  Among its objections, Earth Island included a paragraph titled "Inadequate Range of Alternatives":

> The EA fails to fully analyze a reasonable range of action alternatives, choosing to fully analyze only the proposed action. As a result, alternatives that could potentially meet the project's main goals, while mitigating impacts to Sensitive Species—such as prescribed fire, wildland fire use, and/or precommercial thinning of trees under 8 inches in diameter—were not fully analyzed or considered, in violation of NEPA.

The Service and Earth Island participated in a resolution meeting and a field visit to the Three Creeks Project area. The Service then responded to Earth Island's objections and instructed the District Ranger to clarify and modify the EA as to several objections.

In January 2018, the Service published its final revised EA ("2018 EA") and its decision notice selecting the proposed action alternative and stating a finding of no significant impact (FONSI).  Among other modifications,

the 2018 EA adjusted the desired mean basal area and number of large trees per acre, clarified the size of trees to be cut, and added to its discussion of the Three Creeks Project's potential effect on the black-backed woodpecker and Pacific marten.  The Service did not open an objection or comment period.

Earth Island initiated this action in July 2019, seeking vacatur, injunctive relief, and declaratory relief.  The parties both moved for summary judgment.

During the summer of 2020, while the parties were briefing their cross-motions for summary judgment, the Forest suffered a widespread bark-beetle outbreak.  Bark-beetles wrought massive tree mortality across about 520 acres of the Forest.  Of the infested acres, 220 stood within the Three Creeks Project area.  The 220 acres were limited to two project units.  The Service previously designated both units as "marten units," formerly home to moderate-to-high quality marten habitat the project sought to sustain or improve.  The bark-beetle outbreak reduced the habitat to "low to moderate quality [marten] habitat . . .  rapidly deteriorating into low quality habitat."

The Service issued a supplemental information report ("SIR") evaluating the impact of the bark-beetle outbreak on the Three Creeks Project.  It found that "treatments authorized for the two affected units . . . [were] no longer appropriate[.]"  So the Service removed the entirety of the two affected units (559 acres total) from the project.  It also noted that the two beetle-infested former units constituted only a small percent of the Forest's entire marten habitat, so the project's overall effect on martens would remain the same as discussed in the 2018 EA.  The Service concluded that the bark-beetle outbreak did not warrant further NEPA

analysis "because the effects [of decreasing the project footprint] are within the scope and range of effects as originally analyzed in the environmental assessment and do not result in any new or significant impacts."

On June 11, 2021, Earth Island amended its complaint, alleging that the Service failed to comply with NEPA when it declined to conduct supplemental analysis on the bark-beetle outbreak's impact on the Three Creeks Project.

Three days later, on June 14, 2021, the Service proposed the Inyo Craters Bark Beetle Hazard Tree Abatement Project ("Inyo Craters Project") with a scoping notice. It proposed to cut and remove dead, dying, and infested trees alongside roadways and trails "where they pose the greatest risk" across 950 acres of the Forest—including acreage formerly included in, but since removed from, the Three Creeks Project. The Service sought to approve the Inyo Craters Project through categorical exclusions, per 36 C.F.R. § 220.6(d)(3), (4). Earth Island did not seek leave to file an additional amended complaint. Both parties filed supplemental cross-motions for summary judgment.

In September 2022, the district court granted the Service's motion for summary judgment as to all counts, including nine not argued here. It found that the Service's consideration of two alternatives sufficed under NEPA because 1) two alternatives can be sufficient under NEPA, 2) Earth Island did not show that its proposed alternatives are significantly different from the Service's action alternative, and 3) Earth Island did not show that its proposed alternatives would achieve the same optimal results as the Service's action alternative.

The district court also found that the Service was not required to open another comment period following its 2018

EA, as the changes between the 2017 and 2018 EAs were only clarifications that were "not based on the type of new information or changed circumstances that would necessitate a new comment period."

Finally, the district court found that the Service was not required to engage in further NEPA analysis in response to the bark-beetle outbreak or the Inyo Craters Project. Since the area affected by the outbreak was "so small" compared to the available marten habitat, the outbreak did not constitute a "significant new circumstance" demanding supplemental NEPA analysis. The district court also held that because Earth Island raised the Inyo Craters Project for the first time in its summary judgment motion, the claim was not properly presented. And even if the claim were properly presented, the court found that the Service's 2020 Supplemental Information Report "sufficiently analyzed impacts on martens in both the Three Creeks and the Inyo Craters areas."

Earth Island's appeal followed on March 9, 2023.

## II. Standard of Review

We will review the district court's decision to grant summary judgment de novo. *Frudden v. Pilling*, 877 F.3d 821, 828 (9th Cir. 2017). Agency decisions that allegedly violate NEPA are reviewed under the Administrative Procedure Act. *Am. Wild Horse Campaign v. Bernhardt*, 963 F.3d 1001, 1007 (9th Cir. 2020). Therefore, we will only set those decisions aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We are also asked to determine whether the plaintiff exhausted its administrative remedies and will also review this question

de novo. *Great Basin Mine Watch v. Hankins,* 456 F.3d 955, 961 (9th Cir. 2006).

## III. Discussion

### 1. The Service's Consideration of Alternatives

Earth Island argues that it presented the Service with three viable alternatives, but the Service failed to either analyze these alternatives or explain why these alternatives did not warrant analysis. This failure, Earth Island alleges, violated NEPA.

Earth Island's argument stems from its objections to the 2017 EA, in which it criticized the Service for failing to "fully analyze a reasonable range of action alternatives . . . that could potentially meet the project's main goals, while mitigating impacts to Sensitive Species—such as prescribed fire, wildland fire use, and/or precommercial thinning of trees under 8 inches in diameter." Earth Island now claims that the Service was obligated to either evaluate these alternatives in its 2018 EA or explain why it did not.

#### a. Waiver

The Service argues that since Earth Island did not raise any alternatives during the 2016 EA's public comment period, it did not exhaust its argument regarding the Service's failure to analyze those alternatives. Earth Island concedes that it "did not make an explicit request that specific alternatives be considered" in its comments, but claims that since its comments highlighted "the ineffectiveness of [tree] thinning and the impacts of large tree removal . . . the Service was then put on notice to either incorporate [its feedback] into additional alternatives or explain why such information should not have been considered in additional alternatives." Earth Island further

argues that it complied with the Service's regulations by raising general issues in its comments, then later raising specific legal claims in its objections.

Agencies bear the primary responsibility of complying with NEPA. *Dep't of Transp. v. Public Citizen,* 541 U.S. 752, 765 (2004). Still, a party challenging an agency's compliance with NEPA has its own responsibilities: it must "structure [its] participation so that it . . . alerts the agency to the [party's] position and contentions" so that the agency may give the issue meaningful consideration. *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council,* 435 U.S. 519, 553 (1978).

Crucially, in order to object to an agency's failure to address alternatives, a party must have submitted comments identifying, or otherwise urging, alternative(s) beyond those evaluated in the EA. *Public Citizen,* 541 U.S. at 764-65.[2] If the party fails to identify alternatives in its comments, it

---

[2] Earth Island denies that *Public Citizen's* requirement that issues be exhausted during the comment period applies here. 541 U.S. at 764. It instead proposes that because the Service offers both a comment period *and* an objection process, while the Department of Transportation in *Public Citizen* offered only a comment period, plaintiffs may exhaust issues entirely during the objection period without raising those issues in the comment period. *Id.* But Earth Island puts aside the Service's regulations which require that "[i]ssues raised in objections must be based on previously submitted specific written comments regarding the proposed project[.]" 36 C.F.R. § 218.8(c); Project-Level Predecisional Administrative Review Process, 78 Fed. Reg. 18481, 18483 (Mar. 27, 2013) ("Both the objection eligibility requirement and the constraint on issues raised in objection are included in the proposed and final rule to encourage early and active involvement by the public in project planning and analysis . . . The earlier relevant concerns and information are brought to the attention of the responsible official, the more effective consideration can be ensured.").

"forfeit[s] any objection to the EA on the ground that it failed adequately to discuss potential alternatives to the proposed action." *Id.*; *see also Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke,* 889 F.3d 584, 604-05 (9th Cir. 2018) ("During the notice and comment period, Colusa did not tell the BIA to consider the alternatives it now proposes. Having failed to do so, Colusa has waived any argument that the failure to consider those alternatives represented a violation of NEPA.").

Earth Island admits that it did not identify alternatives in its comments to the 2016 EA, but claims this omission is not fatal to its argument. Instead, it contends that, per *'Ilio'ulaokalani Coalition v. Rumsfeld*, a party can fail to participate in a comment period without waiving its right to challenge the agency's failure to consider certain alternatives. 464 F.3d 1083 (9th Cir. 2006). In *'Ilio'ulaokalani Coalition,* we held that where an agency has independent knowledge of an issue, "there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." *Id.* at 1093 (quoting *Public Citizen,* 541 U.S. at 765). The record in *'Ilio'ulaokalani Coalition* was "replete with evidence"— such as internal comments, emails, and other communications—"that the [agency] recognized the specific shortfall . . . raised by Plaintiffs[.]" *Id.* at 1092.

Earth Island cites no evidence to show that the Service had *independent* knowledge or recognition of a need to analyze additional alternatives. Rather, Earth Island cites its *own* comments to the 2016 EA "regarding the risks of removing medium and large trees and the ineffectiveness of commercial thinning[.]" A third party's comments do not constitute the type of internal knowledge we contemplated in *'Ilio'ulaokalani Coalition.* Nor do third-party complaints

about a planned agency action necessarily require the agency to incorporate or discuss additional alternatives. Such an interpretation of '*Ilio'ulaokalani Coalition* would render meaningless *Public Citizen's* requirement that parties identify alternatives in their comments.

Earth Island alternatively argues that it complied with the Service's objection process by offering general criticisms in its 2016 EA comments, and then explicitly raising viable alternatives in its 2017 EA objections. The Service's objection process requires that "[i]ssues raised in objections must be based on previously submitted specific written comments regarding the proposed project[.]" 36 C.F.R. § 218.8(c). The burden is on the objector to demonstrate the connection between issues it raises in its objections and its previously submitted written comments. 36 C.F.R. § 218.8(c).

As above, the Service was not put on notice to consider Earth Island's suggested alternatives because Earth Island's suggested alternatives were not "based on previously submitted. . . written comments[.]" 36 C.F.R. § 218.8(c). To contend that its 2016 comments "highlight[ed] the need to consider an action alternative [of] not logging any large trees" and therefore put the Service on notice, Earth Island cites one of its comments where it disputed the effectiveness of forest thinning and claimed "the only common denominator that tends to substantially reduce fire intensity and spread is fire itself, and only if it has occurred relatively recently . . . while thinning alone can tend to increase fire intensity[.]" It noted that "thinning is largely irrelevant, and only fire tends to affect future fire behavior—and even then only for a short period of time . . . . Therefore, there were always many areas in which fires were largely unaffected by previous fire, historically." This comment criticizes both

tree thinning *and* fire as futile; it does not highlight "the need to consider an action alternative [of] not logging any large trees," and certainly does not urge the consideration of fire—whether prescribed or wildland—as an alternative. In context, this comment makes sense: In these 2016 EA comments, Earth Island was asking the Service to withdraw the project *entirely*—not to consider additional alternatives. The Service did not understand this comment as a request that it consider alternatives, either. In its response to the comment, the Service explained that the project would use "a suite of treatments" beyond thinning, which would encourage natural non-catastrophic fires or allow for the use of prescribed fires.[3] Nowhere does Earth Island point to a "specific written comment[]" urging the Service to consider additional alternatives, because one does not exist. Therefore, Earth Island cannot satisfy 36 C.F.R. § 218.8(c).

Between Earth Island's failure to suggest alternatives in its 2016 comments and its failure to connect its 2017 objections to a specific comment referencing alternatives, Earth Island's argument that the Forest should have been "put on notice" to consider alternatives is unconvincing. Because Earth Island failed to raise its proposed alternatives during the comment period, it failed to exhaust its argument, and we need not reach the merits of the suggested alternatives.

---

[3] Earth Island also cites *Native Ecosystems Council v. Dombeck* for the contention that a party can exhaust its administrative remedies for a specific issue by asserting its concerns "generally," so as to put the agency on notice. 304 F.3d 886, 889-900 (9th Cir. 2002). But as the Service points out, *Native Ecosystems Council* concerns whether a party exhausted its complaint about an alleged violation of the National Forest Management Act, as a whole—not specific violations of NEPA. *See id.*

### b. Reasonableness of Alternatives

Even if we were to reach Earth Island's alternatives, however, they would fail as unreasonable. NEPA requires federal agencies to "study, develop, and describe appropriate [project] alternatives" in an EA. *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013). The agency must at least consider a "preferred" alternative and a "no action" alternative, and "give full and meaningful consideration to all *reasonable* alternatives." *Id.* (emphasis added); 40 C.F.R. § 1502.4(d), (e). We have repeatedly held that an agency satisfies NEPA when it considers only two alternatives—action and no action. *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1154 (9th Cir. 2008).

An alternative is reasonable if it 1) advances the project's purpose and need, and 2) is "significantly distinguishable from alternatives actually considered, or which have substantially similar consequences." *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dept. of Interior,* 608 F.3d 592, 602 (9th Cir. 2010). In order to determine whether an alternative advances the project's purpose and need, an agency must consider the nature and scope of the proposed action. *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1520 (9th Cir. 1992).

The "significantly distinguishable" requirement is more complicated, as it is defined in the negative. NEPA does not require an agency to consider "every conceivable permutation" of its proposed alternatives. *Westlands Water Dist. v. U.S. Dept. of Interior,* 376 F.3d 853, 872 (9th Cir. 2004); *see City of Los Angeles v. Fed. Aviation Admin.,* 63 F.4th 835, 847 (9th Cir. 2023) (finding that, where an agency considered a variation of a party's suggested alternative,

"NEPA did not require [the agency] to consider further permutations of that alternative"); *see also Vt. Yankee,* 435 U.S. at 551 ("Common sense also teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man."). Nor does NEPA require agencies to evaluate "mid-range" alternatives between action and no action. *Mont. Wilderness Ass'n v. Connell,* 725 F.3d 988, 1004-05 (9th Cir. 2013) (finding that such alternatives are not "necessary to foster informed decisionmaking and public participation").

Earth Island's suggested alternatives are not "significantly distinguishable" from the action alternative the Service considered and are therefore unreasonable. *Westlands Water Dist.*, 376 F.3d at 869.

Earth Island claims the Service should have "fully analyzed or considered" additional alternatives "such as prescribed fire, wildland fire use, and/or precommercial thinning of trees under 8 inches in diameter[.]"[4] Earth Island aptly describes these alternatives as "merely relying on a subset of the actions included in the Service's preferred [action] alternative." In fact, the Service's 2018 EA explains that, in its preferred action alternative, "the vast majority of trees to be thinned would be less than 10 inches in diameter at breast height (dbh)[,]" and "[s]maller trees would be preferentially cut, with trees over 24 inches dbh only

---

[4] It is unclear whether Earth Island intended to present precommercial thinning, prescribed fire, and wildland fire as three separate alternatives to be used exclusively, or one alternative to be used in tandem. Earth Island's use of the phrase "such as" suggests that these alternatives are part of a longer, more extensive list. Earth Island did not provide further explanation or suggested alternatives.

removed when basal area goals could not be met by cutting smaller trees." The Service's preferred alternative also includes the use of prescribed fire.

In arguing that its proposed alternatives would not result in "substantially similar consequences," Earth Island only claims that its alternatives "would preserve the remaining large trees." Here, Earth Island cites a goal—the preservation of the remaining large trees—without explaining how its suggested alternatives could reach that goal, but the Service's action alternative could not. It does not describe how its suggestion of prescribed and wildland fires could ensure large tree preservation when the Service's used of prescribed fire could not, or why thinning trees under eight inches dbh but preserving those between eight and ten dbh could ensure large tree preservation. In short, Earth Island fails to meaningfully distinguish between the consequences of its proposed alternatives and the Service's.

Earth Island claims that the Service also violated NEPA by failing to meaningfully analyze or explain why its proposed alternatives did not warrant meaningful analysis. Earth Island cites *Environmental Defense Center v. Bureau of Ocean Energy Management* for the contention that an agency must give a party's proposed alternatives meaningful analysis or explain why the alternatives did not warrant meaningful analysis. 36 F.4th 850 (9th Cir. 2022). Earth Island does not define the limits of this analysis/explanation requirement—but *Environmental Defense Center* does. There, we found that the agencies "did not meet their obligation under NEPA to give full and meaningful consideration to all *reasonable* alternatives." *Id.* at 877 (quotations omitted) (emphasis added). As discussed above, Earth Island's proposed alternatives—even if properly

exhausted—were not "reasonable," and therefore did not require analysis.[5]

Finally, we must consider the Service's determination that the Three Creeks Project would not have a significant environmental effect. We held in *Earth Island Institute v. U.S. Forest Service* that "it makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined, through its decision not to file an impact statement, will have no significant environmental effects anyway." 697 F.3d 1010, 1023 (9th Cir. 2012) (quoting *Sierra Club v. Espy*, 38 F.3d 792, 803 (5th Cir. 1994)). Therefore, we cannot fault the Service for considering only two alternatives for the Three Creeks Project.

Since Earth Island failed to suggest alternatives during the comment period and failed to raise reasonable alternatives during the objection period, and since the Service concluded that the Three Creeks Project would not have a significant environmental effect, Earth Island's argument fails.

### 2. The 2018 EA

Earth Island contends that the Service was required to circulate its 2018 EA for public comment because the EA contained substantial changes to the Three Creeks Project's desired forest conditions, the methods proposed to achieve

---

[5] Earth Island cites *Environmental Protection Information Center (EPIC) v. U.S. Forest Service* to contend that the Service must analyze an alternative that only uses precommercial thinning, and that the Service's dismissal of such an alternative with only a "cursory" explanation violates NEPA. 234 Fed. Appx. 440, 443 (9th Cir. 2007). But *EPIC* is an unpublished decision and is not precedential.

these conditions, and the project's expected effect on the Pacific marten and black-backed woodpecker.

Both the Service and NEPA impose standards on public participation in the EA preparation process. NEPA's standards are "amorphous." *Cal. Trout v. F.E.R.C.,* 572 F.3d 1003, 1017 (9th Cir. 2009). It requires agencies to offer a "not substantial" level of public participation. *Id*. We held that NEPA does not require agencies to circulate a draft EA in every case. *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs,* 524 F.3d 938, 952 (9th Cir. 2008). But it does require agencies to "provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Id*. at 953.

The Service's regulations, on the other hand, require it to offer the opportunity for public comment after it prepares an EA "based on consideration of new information or changed circumstances[.]" 36 C.F.R. §§ 218.22(a), (d). We have not previously interpreted this regulation, but our discussion of public comments in *California v. Block* informs our analysis here. 690 F.2d 753, 771 (9th Cir. 1982).

Public comments are intended to help agencies assess an action's environmental impact, so the agency can then modify its next draft or final EA to reflect that public input. *Id.* If an agency had to file a supplemental draft EA and repeat the public comment process every time it makes any such modifications, the NEPA review process would never end, and agencies would balk at modifying their EAs. *Id.* An agency is therefore not required to repeat the public comment process when the EA is only a slightly modified version of a draft EA. *Id.* at 771 (holding that repeating the

public comment process is unnecessary "when only minor modifications are made" to a draft EA).  Conversely, an agency is required to repeat the public comment process when the EA includes substantial changes relevant to environmental concerns.  *See Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 548 (8th Cir. 2003).

Earth Island dismisses the above analysis as an "artificially elevated threshold" and instead relies almost exclusively on the Service's regulation requiring public comment every time the Service publishes an EA "based on consideration of new information or changed circumstances[.]"  36 C.F.R. §§ 218.22(a), (d).  But forcing the Service to circulate a draft EA *every time* new information or circumstances emerge, without measure of degree or further analysis, would force the Service into the Sisyphean loop we cautioned against in *Block*: circulating draft EA after draft EA when presented with even a scintilla of new information or circumstances.  690 F.3d at 771; *see also Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997) (cautioning against tasking agencies "with a [S]isyphean feat of forever starting over in their environmental evaluations, regardless of the usefulness of such efforts").  Therefore, the Service's regulation on public participation must be read together with our NEPA guidance:  the Service is required to circulate a draft EA based on consideration of new information or changed circumstances, *unless* the EA has undergone only slight modifications from its last circulated version.

Earth Island's claim fails because the 2018 EA was a slightly modified version of the 2017 EA and was not based on new information or changed circumstances, and therefore did not require a public comment period.  36 C.F.R.

§§ 218.22(d). The 2018 EA contained two changes at issue here.

First, Earth Island argues that the change to desired forest conditions and methods constitutes "new information or changed circumstances" requiring an opportunity for public comment. 36 C.F.R. § 218.22(d). In the 2017 EA, the project area's desired mean basal area was 147 square feet per acre, the desired number of large trees was 22 per acre, and the "vast majority" of trees to be cut were between 10-20 inches in diameter. In the 2018 EA, the desired mean basal area was 70-152 square feet per acre, the desired number of large trees was 14 per acre, and the "vast majority" of trees to be cut were below 10 inches in diameter if nonmerchantable and 10-20 inches in diameter if merchantable. Both the 2017 and 2018 EAs make clear that trees between 24-30 inches dbh would be removed only if the basal goals could not be otherwise achieved. The 2018 EA also, for the first time, included the desired number of trees per acre (37-29) and the desired mean tree dbh (22 inches).

Earth Island claims these modifications represent a substantial change in course from the 2017 EA. But as the Forest Service points out, these changes were minor modifications that were not "based on consideration of new information or changed circumstances" and did not "differ[] sufficiently from the alternatives canvassed in the draft [EA] to warrant the circulation for public comment[.]" 36 C.F.R. §§ 218.22(d); *Block*, 690 F.2d at 772. The overarching plan to thin the project area to an average basal area of 70 to 140 square feet per acre remained the same between the 2017 and 2018 EAs. The desired mean basal area changed from a singular number (147 square feet per acre) to a range that encompassed that number (70-152 square feet per acre). Per

Earth Island's request, the Service clarified the size of merchantable versus nonmerchantable trees to be cut, but the sizes remained within the range discussed in the 2017 EA. Again, per Earth Island's request, the Service included the desired trees per acre and desired mean tree diameter as clarifications.  As perhaps the greatest change between the 2017 and 2018 EA, the Service reduced the desired number of large trees per acre by eight—but again, despite this change, the overarching desired conditions remained consistent.  These minor changes and clarifications follow *Block's* encouragement of minor modifications in response to public input, and do not require further public comment.

Second, Earth Island claims that the discussion of the project's impact on the black-backed woodpecker and Pacific marten constituted new information requiring public comment.  36 C.F.R. § 218.22(d).  In its 2017 EA, the Service discussed the potential impact of forest treatment on the black-backed woodpecker and concluded that "[h]abitat for black-backed woodpecker may be enhanced through project implementation."  The Service also discussed collecting data on the black-backed woodpecker as a Management Indicator Species in its response to public comments on the 2017 EA.  The 2018 EA included a somewhat more detailed discussion of the black-backed woodpecker's preferred habitat, but again concluded that its habitat "may be enhanced through project implementation." The Service's conclusions on Pacific martens remained similarly consistent.  Its 2017 EA concluded that the project would have "little direct or indirect" impact on martens generally across the project area, no impact within the marten units, and could possibly even improve some habitat components.  Its 2018 EA concluded the same, but also cited a study Earth Island discussed in its 2017 objections.  Since

the 2018 EA maintained the same conclusions as the 2017 EA regarding the black-backed woodpecker and Pacific marten and otherwise only contained minor modifications, the Service was not required to offer another public comment period.

### 3. The 2020 Bark-Beetle Outbreak

Earth Island argues that, following the 2020 bark-beetle outbreak, the Service was obligated to supplement its NEPA analysis for the Three Creeks Project.

NEPA requires agencies to prepare a supplemental EA when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1)(ii) (2020). "New circumstances" are circumstances which significantly change the underlying project, and "new information" is intervening information not already considered. *Prot. Our Cmtys. Found. v. LaCounte,* 939 F.3d 1029, 1041 (9th Cir. 2019) (holding that information is not new when it merely confirms concerns that an EIS articulated and considered). Agencies need not supplement their NEPA analyses every time new information or circumstances emerge. Rather, the new information or circumstances must show that the action will affect the quality of the human environment in a significant manner or to an extent not already considered. *Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 376 (1989).[6] NEPA and its

---

[6] Earth Island argues that *Marsh* should not apply, because it articulates the standard for supplementing an EIS rather than an EA. 490 U.S. 360. But the standard for supplementing an EA or EIS is the same. *See Price Rd. Neighborhood Ass'n, Inc.*, 113 F.3d at 1509 (holding that the standard for supplementing an EA is the same as for an EIS); *see also*

implementing regulations do not explain how agencies are to evaluate the significance of new information or circumstances, but we condoned the use of Supplemental Information Reports (SIRs) for this purpose. *Idaho Sporting Cong. Inc. v. Alexander,* 222 F.3d 562, 566 (9th Cir. 2000). Supplementation is not required when an agency takes a "hard look" at the new circumstances or information in an SIR and determines that the impact will not be significantly different from those it already considered. *Idaho Wool Growers Ass'n v. Vilsack,* 816 F.3d 1095, 1107 (9th Cir. 2016). An agency's decision not to supplement its NEPA analysis is set aside if it was arbitrary and capricious. *Marsh,* 490 U.S. at 376.

Earth Island contends that the 2020 bark-beetle outbreak triggered the Service's duty to supplement its NEPA analysis, and the Service's failure to supplement its analysis was arbitrary and capricious, for two reasons: first, the Service's removal of two of the three marten units from the Three Creeks Project constituted a significant new circumstance; second, the Service altered the Three Creeks Project to an extent its 2018 EA did not consider, which also constituted a significant new circumstance. The Service denies that these decisions were "significant new circumstances" that would demand supplemental NEPA analysis.

The 2020 bark-beetle outbreak killed 220 acres of trees within the Three Creeks Project area. In response to the outbreak, the Service published an SIR explaining that the outbreak and resulting tree death "progressed to a level such that the Three Creeks treatment prescription [was] no longer

---

*Tri-Valley CARES v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012) (applying *Marsh*'s EIS supplementation standard to an EA).

adequate to stop or slow the spread of the beetle kill" in the 220 affected acres. The Service elected to remove the entirety of the two affected units—a total of 559 acres—from the project.

These units were two of the Three Creeks Project's three "marten units": acres of generally high-quality marten habitat within the project area where marten use was well-documented. But Inyo National Forest is home to many acres of marten habitat beyond the Three Creeks Project area. As the 2020 SIR explained, the forest hosts 205,000 total acres of moderate-and high-quality marten habitat, 1.8% of which was lost to the bark-beetle outbreak. The SIR concluded that the area affected by the outbreak is "so small compared to the overall available habitat that it [would] not affect overall marten success in its range on the Inyo National Forest, and Project treatments will not further reduce this overall habitat availability."

Earth Island contends that the lost marten habitat constituted a "significant new circumstance" requiring supplemental NEPA analysis because ninety percent of the Three Creeks Project's marten habitat was removed from its footprint, martens "rarely use Project areas outside of the three identified units," and it is not "biologically realistic that the resident martens will now all occupy the [Project's] remaining [ten] percent of marten habitat." Earth Island's argument presumes that martens are limited to the Three Creeks Project area, and that the bark-beetle outbreak in the project's marten units would therefore force the martens from the marten units into the larger, less hospitable project area. Earth Island has offered no support for this argument, which the record belies. As the 2020 SIR states, Inyo National Forest is home to 205,000 total acres of marten habitat. The vast majority of this habitat lies outside the

Three Creeks Project area, in the martens' preferred red fir and mixed conifer habitats.  Only 1.8% of the total marten habitat—a "minor loss"—was affected by the beetle outbreak.  Since, as the 2018 EA states, martens seldom use the Three Creeks Project area, it stands to reason that the martens would occupy the larger, preferred marten habitat rather than the smaller, less-preferred project area.  Because the bark-beetle outbreak and changes to the Three Creeks Project footprint did not alter the marten habitat outside the project area, neither constituted a "significant new circumstance."[7]

Earth Island cites *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton* for the proposition that an agency must supplement its NEPA analysis when it eliminates provisions intended to lessen a project's environmental impact.  752 F.3d 755 (9th Cir. 2014)*.*  In *Connaughton,* the Service adopted a final EIS for a logging project.  *Id.* at 760.  In its EIS, the Service

---

[7] Earth Island also argues that a supplemental EA is required if new significant information has "uncertain" potential impacts.  This argument was made for the first time in Earth Island's reply.  Earth Island claims that since it is "uncertain" where the martens will move following the bark-beetle outbreak, the Service must conduct supplemental NEPA analysis beyond the 2020 SIR.  It quotes *Price Road*—a case concerning the redesign of a highway interchange—for this contention.  113 F.3d at 1508-09 ("[I]f the environmental impacts resulting from the design change area significant or uncertain, as compared with the original design's impacts, a supplemental EA is required.").  This quote must be interpreted in the specific context of the redesign plan contemplated in *Price Road.*  Otherwise, requiring an agency to produce a supplemental EA or EIS every time *any* uncertainty arises (regardless of the significance of the uncertainty) would conflict with our established precedent, and certainly burden agencies to supplement their NEPA analyses far beyond the current standard.

acknowledged the project would likely harm elk and proposed a travel management plan to improve elk security. *Id.* But following the EIS adoption, the Service withdrew the travel management plan. *Id.* at 760-61. We found that the Service was required to supplement its EIS following the plan's withdrawal because the logging project relied on the plan to mitigate its harm to elk. *Id.* at 761. Here, Earth Island analogizes the elk with the marten, and the withdrawn travel management plan with the removed marten units. But the two cases are not analogous. In *Connaughton,* the Service acknowledged within its EIS that the logging project would harm elk and relied on a travel management plan to address that harm. But in the Three Creeks Project, the Service determined that "[t]here would be no long-term change in marten habitat sustainability." In other words, unlike the traffic management plan in *Connaughton,* the Three Creek Project's marten units were not intended to mitigate the project's "little direct or indirect impact on martens," but were rather intended to retain already-existing marten habitat in the units. Therefore, the removal of two marten units from the Three Creeks Project did not significantly change the project's already minimal effect on the marten.

Earth Island also alleges that removal of two marten units caused the Three Creeks Project to fall "qualitatively [outside] the spectrum of alternatives that were discussed" in the 2018 EA, and therefore requires supplemental NEPA analysis. *Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011). Essentially, Earth Island wants the public to have the opportunity to comment on the 2018 EA for the Three Creeks Project, less two marten units.

Curiously, Earth Island cites *Russell Country Sportsmen* to support its claim.  In *Russell Country Sportsmen,* we adopted the Council for Environmental Quality's guidance on changes to a proposed action that require supplemental NEPA analysis.  *Id.* at 1045.  We held that supplementation is not required when 1) the modified project is a minor variation of one of the alternatives discussed in the draft EA/EIS, and 2) the modified project is qualitatively within the spectrum of alternatives that were discussed in the draft EA/EIS.  *Id*.  As discussed above, the marten units as described in the 2018 EA were not intended to mitigate the Three Creeks Project's harm to martens, because the project did not harm martens.  Therefore, the removal of two marten units was not a "substantial change[]" relevant to environmental concerns, but a "minor variation[]" that geographically shrunk the project's footprint and remained "qualitatively within the spectrum of alternatives that were discussed" in the 2018 EA.  *Id.* at 1047.  As in *Russell Country Sportsmen,* the Service here had "very little reason to believe the modified [Three Creeks Project] plan [would] have environmental impacts that the agency had not already considered."  *Id.* at 1049.

### 4. The Inyo Craters Project

Finally, Earth Island alleges that the Service was required to supplement the 2018 EA in response to the Inyo Craters Project.  Earth Island raised this claim for the first time in its summary judgment motion.  Since this claim was not properly presented to the district court, we will not consider it.

In its complaint, a plaintiff must give the defendant fair notice of its claims and the grounds upon which its claims rest.  Fed. R. Civ. P. 8; *Pickern v. Pier 1 Imports (U.S.), Inc.*,

457 F.3d 963, 968 (9th Cir. 2006). Rule 8's pleading standard is "liberal," but still requires that the defendant receives notice as to what is at issue in the case. *Id.*; *Am. Timber & Trading Co. v. First Nat'l Bank of Oregon*, 690 F.2d 781, 786 (9th Cir. 1982). "[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings." *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006).

Earth Island filed its amended complaint on June 11, 2021. It raised the Service's alleged failure to undertake supplemental NEPA analysis in response to the bark-beetle outbreak and subsequent removal of the marten units from the Three Creeks Project, as discussed above. Three days after Earth Island filed its amended complaint, on June 14, 2021, the Service announced the Inyo Craters Project. This new project's purpose was to remove dead or dying trees— victims of the bark-beetle outbreak—from hazardous positions next to roads and trails. The Inyo Craters Project shared some borders, but not land, with the Three Creeks Project.

Since Earth Island did not again amend its complaint following the project announcement, Earth Island's complaint did not mention the Inyo Craters Project, did not notify the Service that the Inyo Craters Project would be at issue in the litigation, and did not tell the Service the grounds of its Inyo Craters Project claim. Instead, Earth Island's failure-to-supplement claim was limited to the effect of the 2020 bark-beetle outbreak on the Three Creeks Project's marten units. The claim did not mention possible future projects, and certainly not future projects that did not share land or purpose with the Three Creeks Project. Earth Island now claims that since the Inyo Craters Project was "within

the scope" of its failure-to-supplement claim, the project's absence from its amended complaint is "immaterial."

Earth Island cites *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 558-59 (9th Cir. 2000), to contend that we have "upheld the ability of environmental plaintiffs to support their claim alleging the Forest Service's failure to prepare supplemental NEPA analysis by raising new facts not alleged in their complaint." Our holding in that case, however, was not quite so broad.

*Friends of the Clearwater* concerned the Service's failure to supplement a ten-year-old EIS regarding a timber sale. *Id.* at 555-56. In its complaint, the plaintiff alleged that the Service's EIS had become outdated after ten years of intervening information. *Id*. at 555. It focused on multiple species of animals present in the timber area that had been listed under the Endangered Species Act. *Id*. at 555. In its motion for summary judgment, the plaintiff maintained the bones of its claim but shifted its factual focus to two sources of "significant new information": first, that the Service designated seven species present in the timber sale area as "sensitive species," and second, that the Service published a document acknowledging the information on which its timber sale EIS relied was inaccurate and required a new analysis and standards. *Id*. at 555-56. We held that the plaintiff's failure to specify these supporting facts until summary judgment did not excuse the Service's failure to evaluate its EIS over the preceding ten years. *Id.* at 558-59. We did not hold that this plaintiff—or any other environmental law plaintiff—is absolved of its duty to include the factual basis of its claims in its complaint or is free to raise new claims in its motion for summary judgment.

Earth Island is correct that the Service, like any agency, has a duty to gather and evaluate new information relevant to the environmental impact of its actions, and must be aware of information it generates itself. *Id*. at 559. But Earth Island conflates knowledge of facts with knowledge of claims. The Service was aware of its announcement of the Inyo Craters Project. But the Service was not aware that the Inyo Craters Project would be at issue in this litigation because Earth Island failed to allege such a claim in its amended complaint.

To hold the Service responsible for predicting an unalleged claim would be to expect the Service—or any agency—to act as mind readers and foresee all possible unalleged claims that *may* fall under a complaint. Since Earth Island did not plead this claim in its complaint, it was not properly before the district court, and fails.

### IV. Conclusion

For these reasons, the district court's grant of summary judgment to the Service is AFFIRMED.