**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

FRIENDS OF ANIMALS,

        *Plaintiff - Appellant*,

  v.

DOUG BURGUM, in his official capacity as Secretary of the Interior; UNITED STATES BUREAU OF LAND MANAGEMENT, an Agency of the United States,

        *Defendants - Appellees*.

No. 24-5786

D.C. No. 3:22-cv-00365-ART-CLB

OPINION

Appeal from the United States District Court
for the District of Nevada
Anne R. Traum, District Judge, Presiding

Argued and Submitted October 21, 2025
Phoenix, Arizona

Filed January 14, 2026

Before: Richard C. Tallman, Bridget S. Bade, and Kenneth K. Lee, Circuit Judges.

Opinion by Judge Tallman

# SUMMARY[*]

## Wild Free-Roaming Horses and Burros Act / National Environmental Policy Act

The panel affirmed the district court's summary judgment in favor of the U.S. Bureau of Land Management (BLM) in an action brought by Friends of Animals challenging BLM's decision to approve a contract with JS Livestock for a new off-range corral (ORC) on private land in Winnemucca, Nevada, to hold and feed up to 4,000 wild horses and burros.

The panel held that Friends established representational standing on behalf of its members at summary judgment. The specificity of the members' allegations and their concrete plans to visit the Winnemucca ORC were sufficient to establish an imminent, concrete, and particularized injury. A sufficient causal connection between the alleged injury and the challenged action also existed. Finally, the interests at stake were germane to Friends' interests in protecting animals, and neither the claims asserted nor the relief requested required individual participation in the lawsuit.

The Wild Free-Roaming Horses and Burros Act (Wild Horses Act) requires BLM to protect and manage wild free-roaming horses and burros as components of the public lands, and that excess animals be humanely captured and removed for private maintenance and care. To comply with the Wild Horses Act and its regulations, BLM required JS Livestock to follow BLM's Comprehensive Animal Welfare

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Program Standards and imposed additional requirements through its contract solicitation. Friends argued that the Standards and requirements did not protect the animals from unnecessary stress and suffering. The panel declined Friends' invitation to review BLM's determinations of what practices were necessary for humane treatment, and held that Friends had not shown that BLM abused its discretion by relying on the Standards and additional contract requirements to ensure humane treatment of the animals under the Wild Horses Act.

The panel rejected Friends' argument that BLM violated the National Environmental Policy Act (NEPA). First, BLM took the requisite "hard look" at the Project's environmental consequences as required by NEPA. Second, BLM conducted a reasonable analysis of project alternatives. Finally, BLM provided a convincing statement of reasons to explain why the Project's impacts were insignificant, and why it issued a Finding of No Significant Impact. Therefore, BLM did not violate NEPA when it decided not to issue an environmental impact statement.

## COUNSEL

Andreia E. Marcuccio (argued) and Jennifer Best, Friends of Animals, Wildlife Law Program, Centennial, Colorado, for Plaintiff-Appellant.

Rebecca Jaffe (argued), Mark Pacella, Rickey Turner, and Ezekiel A. Peterson, Attorneys; Environment & Natural Resources Division; Adam R.F. Gustafson, Acting Assistant Attorney General; United States Department of Justice, Washington, D.C.; Virginia Tomova, Assistant United States Attorney, Office of the United States Department of Justice, Las Vegas, Nevada; Janell Bogue, Attorney, United States Department of the Interior, Sacramento, California; for Defendants-Appellees.

Jennifer R. Lovko, Greenfire Law PC, Berkeley, California, for Amici Curiae Wild Horse Education and Rewilding America Now.

**OPINION**

TALLMAN, Circuit Judge:

At issue in this case is the United States Bureau of Land Management's (BLM) decision to approve a contract for a new off-range corral (ORC) on private land near Winnemucca, Nevada, to hold and feed up to 4,000 wild horses and burros. Plaintiff-Appellant Friends of Animals (Friends) contends that BLM's decision violated the Wild Free-Roaming Horses and Burros Act (Wild Horses Act) and the National Environmental Policy Act (NEPA). The parties filed cross-motions for summary judgment below. Finding no violation of either statute, the district court granted summary judgment in favor of BLM. Seeing no violations either, we affirm.

**I**

**A**

In the early 1970s, the population of wild horses on public lands had declined significantly because of the encroachment of man and the continued impact of so-called "mustangers" who harvested wild horses for commercial purposes. In response to public outcry over this population decline, Congress enacted the Wild Horses Act in 1971 to protect these animals, which were "fast disappearing from the American scene." 16 U.S.C. § 1331. Declaring that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," *id.*, Congress thus "extended federal protection to wild horses and empowered BLM to manage horses roaming public ranges as part of its management of public lands." *Am. Wild Horse*

*Campaign v. Bernhardt*, 963 F.3d 1001, 1004 (9th Cir. 2020).

As it turns out, though, wild horses and burros have virtually no natural predators, and herd sizes can double every four years.  The Wild Horses Act became "so successful at replenishing the population of wild horses that 'action [was] needed to prevent [the] program from exceeding its goals and causing animal habitat destruction.'" *Id.* at 1004–05 (alteration in original) (quoting H.R. Rep. No. 95-1122, 95th Cong., 2d Sess. 23 (1978)).  Accordingly, Congress amended the Wild Horses Act so that BLM could more effectively "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a).

Under the amended Wild Horses Act, Congress requires BLM to maintain an inventory of wild horses and burros on public lands so that BLM can determine whether "an overpopulation exists on a given area" and whether "action is necessary to remove excess animals." *Id.* § 1333(b)(2).  If BLM makes such a finding, it "shall immediately remove excess animals from the range so as to achieve appropriate management levels." *Id.*  Removals must continue "until all excess animals have been removed so as to restore a thriving natural ecological balance to the range, and protect the range from the deterioration associated with overpopulation." *Id.*

Through its Wild Horse and Burro Program, BLM has removed thousands of animals from the range to control herd sizes as mandated by the Wild Horses Act.  When BLM removes excess animals from the range, it moves them to ORCs throughout the United States.  ORCs primarily serve as temporary holding and preparation facilities for wild

horses and burros after they have been removed from the public range through gather-and-removal operations. The animals are then prepared for adoption by the public or for placement in longer-term facilities known as off-range pastures (ORPs). While at an ORC, animals are transitioned to hay diets, examined by veterinarians, given necessary vaccinations and deworming procedures, provided hoof care, and may even be trained in advance of adoption or sale. Each ORC is designed to handle large numbers of animals with pens, corrals, alleys, and loading areas that facilitate animal movement.

**B**

In March 2019, BLM estimated that there were over 88,000 wild horses and burros on public lands—more than three times higher than the appropriate management level. At that time, BLM did not have enough ORC capacity to accommodate the wild horses and burros removed from the range. And if left unchecked, this increasing overpopulation would harm the land, other species, and the wild horses and burros themselves. Accordingly, in 2020, BLM solicited proposals for new ORCs to be located in Idaho, Nevada, and Utah. The solicitation required that each ORC be able to provide humane care for a one-year period and provided a renewal option for four or nine one-year extensions. The animals would remain in the ORCs until placed into private maintenance through adoptions or sales, or transported to permanent ORPs.

JS Livestock submitted a proposal to build an ORC in Winnemucca in Humboldt County, Nevada, in response to BLM's solicitation (Winnemucca ORC or Project). JS Livestock proposed to construct the Project on 100 acres of private land previously used for growing alfalfa. The

Winnemucca ORC would house up to 4,000 wild horses and burros. BLM issued JS Livestock an "apparent awardee letter," confirming that it would award the contract upon successful completion of an environmental assessment (EA).

BLM then prepared a draft EA for the Winnemucca ORC; notified interested individuals, organizations, and agencies; and made the draft EA available for public comment. BLM received over 6,700 comments, including comments from the Nevada Division of Wildlife, Humboldt County, and special interest groups, including Friends. In November 2021, BLM issued the final EA, Finding of No Significant Impact (FONSI), and Record of Decision (ROD). BLM concluded that an environmental impact statement (EIS) was unnecessary because the Winnemucca ORC would not significantly impact the environment.

BLM issued the contract to JS Livestock after JS Livestock obtained the required permits. BLM informs us that the Winnemucca ORC is now operating and currently houses about 3,000 animals.

Friends filed suit challenging BLM's action to contract with JS Livestock for the Winnemucca ORC. Both parties moved for summary judgment. The district court denied Friends' motion and granted BLM's motion, holding that BLM complied with NEPA and the Wild Horses Act. This appeal followed.

## II

Because this case involves purported violations of the Wild Horses Act and NEPA, the district court had original jurisdiction pursuant to 28 U.S.C. § 1331. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

"This court reviews de novo a grant of summary judgment." *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1061 (9th Cir. 2014). In doing so, "[w]e 'must determine, viewing the evidence in the light most favorable to the nonmoving party, whether the district court correctly applied the relevant substantive law and whether there are any genuine issues of material fact.'" *Id.* (quoting *Balint v. Carson City*, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc)).

Because the Wild Horses Act and NEPA do not articulate a standard of review, we review BLM's action under the Administrative Procedure Act (APA). *Id.* Under the APA, we must set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Agency action is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *350 Mont. v. Haaland*, 50 F.4th 1254, 1263 (9th Cir. 2022) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)).

## III

### A

We examine first whether Friends has standing to bring this case. Although BLM does not renew its argument on appeal that Friends lacks standing, because "[s]tanding is a necessary element of federal court jurisdiction," "we must determine that standing exists" before proceeding further.

*Animal Prot. Inst. of Am. v. Hodel*, 860 F.2d 920, 923 (9th Cir. 1988).

The district court concluded that Friends established representational standing on behalf of its members at summary judgment. We agree.

An organization "has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

Turning to the first element, members of an organization establish standing in their own right when (1) they have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical'"; (2) the injury is "fairly traceable to the challenged action," meaning there is "a causal connection between the injury and the conduct complained of"; and (3) it is likely that a favorable judicial decision will redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citation modified). "Cognizable injuries include harm to aesthetic interests and environmental well-being." *Animal Prot. Inst. of Am.*, 860 F.2d at 923.

Here, three of Friends' members submitted declarations at summary judgment describing their interest in wild horses and burros. Two members live in Nevada, allege a deep connection to the animals, and state that they feel compelled to check on the animals at the Winnemucca ORC. One member described an attempt he made to visit the Project site, as well as his plans to visit the animals in light of BLM's

public tours of the site. The members further described alleged "inhumane and dangerous" conditions particular to the Project and explained how seeing the animals there will cause them "great sadness" and distress.

The specificity of the members' allegations and their concrete plans to visit the Winnemucca ORC are sufficient under our precedent to establish an imminent, concrete, and particularized injury. *See id.* at 924 (holding that plaintiff organization's members "have a special interest in monitoring the well-being of wild horses and burros removed from the range and kept in BLM holding facilities"); *see also Seattle Audubon Soc. v. Espy*, 998 F.2d 699, 703 (9th Cir. 1993).

A sufficient causal connection between the alleged injury and the challenged action also exists. But for BLM's decision awarding the contract, Friends' members would not be subjected to the alleged injury to their aesthetic interests. A favorable outcome for Friends also would redress the alleged injury: its members would not be subjected to viewing wild horses and burros in allegedly inhumane conditions if this court finds in Friends' favor. Thus, Friends' members have shown standing to sue in their own right.

In addition, the interests at stake are germane to Friends' interests in protecting animals, and neither the claims asserted nor the relief requested require individual participation in the lawsuit. Accordingly, Friends has established representational standing to bring this lawsuit.

## B

Turning to the merits, we first consider Friends' Wild Horses Act claim.

The Wild Horses Act requires BLM to "protect and manage wild free-roaming horses and burros as components of the public lands," 16 U.S.C. § 1333(a), and mandates that excess animals "be humanely captured and removed for private maintenance and care." *Id.* § 1333(b)(2)(B). The implementing regulations in turn prohibit "[t]reating a wild horse or burro inhumanely." 43 C.F.R. § 4770.1(f). "Humane treatment means handling compatible with animal husbandry practices accepted in the veterinary community, without causing unnecessary stress or suffering to a wild horse or burro." *Id.* § 4700.0-5(e). "Inhumane treatment means any intentional or negligent action or failure to act that causes stress, injury, or undue suffering to a wild horse or burro and is not compatible with animal husbandry practices accepted in the veterinary community." *Id.* § 4700.0-5(f).

To comply with the Wild Horses Act and its regulations, BLM required JS Livestock to follow BLM's Comprehensive Animal Welfare Program Standards (Standards), which provide comprehensive guidance for building and managing ORCs. BLM developed these Standards in collaboration with veterinarians and animal welfare experts from the School of Veterinary Medicine at the University of California, Davis, and based on its own expertise. BLM also periodically reviews the Standards and modifies them as necessary to improve effectiveness in ensuring humane care for wild horses and burros. The Standards set forth requirements addressing, among other things, the condition of ground surfaces, vaccination procedures, water systems, feeding areas, and shade and shelter. They also require an on-site or on-call veterinarian's routine presence at the ORC. Animals "must be evaluated daily by facility personnel to identify animals in poor body

condition, poor hoof condition, injured, or in need of veterinary evaluation/treatment, and/or supplemental feeding."

BLM imposed additional requirements through its contract solicitation, which is incorporated by reference into the ROD. These additional requirements include, for example, that all pens be cleaned twice per year or more often when warranted; each pen provide at least 700 square feet per animal and hold a maximum of 100 animals;[1] animals be fed good quality alfalfa or grass-alfalfa mix hay sufficient to meet their nutritional needs; and contractors minimize excitement and stress of animals in corrals and chutes to prevent injuries.

Friends contends that the Standards and requirements do not protect the animals from unnecessary stress and suffering. Relying on public comments in the record, Friends maintains that the Project's requirements for the density and number of animals, the size of the facilities, cleaning and disease management, and extreme weather shelter are all incompatible with accepted animal husbandry practices. Based on our review of the record, BLM addressed each of these issues through the Standards and additional contract solicitation requirements. Friends simply disagrees with BLM's determination of what practices are necessary for humane treatment and asks us to reweigh the evidence in favor of its own experts. But it is not within our purview to "engage in a battle of experts," *Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 577 (9th Cir. 1998) (citation omitted), and we decline Friends' invitation to do so. BLM is "entitled to rely on the opinions

---

[1] The Winnemucca ORC as designed exceeds this requirement as each pen has approximately 750 square feet per animal.

of its own experts," which it did here. *HonoluluTraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1233 (9th Cir. 2014); *see also Idaho Sporting Cong., Inc. v. U.S. Forest Serv.*, 92 F.3d 922, 928 (9th Cir. 1996). Such reliance was not arbitrary and capricious. *See HonoluluTraffic.com*, 742 F.3d at 1233.

Friends raises three additional arguments as to the Standards, which we address now. First, Friends points out that the Standards never went through notice and comment rulemaking and are not referenced in the Wild Horses Act or its regulations. While it is true that the Standards have not been vetted through the formal rulemaking process and are not referenced in the Wild Horses Act, it is not particularly relevant. The real question here is whether BLM acted reasonably in determining that the Standards, developed in collaboration with veterinary experts, adequately ensure humane treatment of animals at the Project, which, as discussed above, it did.

Second, Friends cites various incidents and animal deaths that have occurred at other ORCs as evidence that the Standards will not ensure the animals at the Winnemucca ORC are humanely treated. Here, however, BLM has imposed additional requirements beyond the Standards. Moreover, Friends does not provide evidence that the incidents and deaths to which it cites are a result of compliance with the Standards. To the extent Friends argues that ORCs are inherently more hazardous than the wild, even if true, that does not mean that ORCs are necessarily inhumane.

Third, Friends emphasizes that the Standards are not site-specific to the Project, particularly as to shade and shelter. But BLM considered the Standards in relation to the

Winnemucca ORC. With respect to shade and shelter, the Standards require that ORCs "provide access to shade and shelter . . . for compromised animals," and that ORC managers evaluate and determine additional provisions for shade and shelter as appropriate. As a term of the contract, BLM is requiring JS Livestock to do so. The contract solicitation further mandates that "[s]eparate corrals (with a minimum of 400 sq. ft./animal) shall be available for confining lame, sick, or compromised animals needing special care, and must have access to overhead shelter and wind break available within the corrals." Accordingly, the Standards are sufficiently specific to the Winnemucca ORC.

In sum, Friends has not shown that BLM abused its discretion by relying on the Standards and additional contract requirements to ensure humane treatment of the animals under the Wild Horses Act.

## C

We next consider Friends' challenge to the district court's holding that BLM did not violate NEPA. Friends contends that BLM violated NEPA by failing to (1) take a "hard look" at the Project's environmental impacts, (2) address reasonable alternatives, and (3) prepare an EIS.

NEPA facilitates informed decisionmaking by requiring agencies to consider the environmental impacts of their actions. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348–51 (1989). "NEPA does not contain substantive environmental standards," but instead "establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002) (quoting *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000)). Thus, while "NEPA

requires the agency to analyze environmental impacts and prepare documents and make such analyses available for public inspection, 'NEPA does not require the agency to weigh environmental consequences in any particular way.'" *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 880 (9th Cir. 2025) (quoting *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 173 (2025)).

The procedural nature of NEPA limits the scope of judicial review for these cases.  As the Supreme Court has recently reiterated, "[t]he bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 185; *see Cascadia Wildlands*, 153 F.4th at 903 (explaining that while *Seven County* addressed a challenge to an EIS, "its teachings [are] fully applicable" in the context of a challenge to an EA).

Procedurally, an agency must prepare an EIS when "undertaking a 'major Federal action[] significantly affecting the quality of the human environment.'" *Montana Wildlife Fed'n v. Haaland*, 127 F.4th 1, 20 (9th Cir. 2025) (alteration in original) (quoting 42 U.S.C. § 4332(C)).  "To determine whether an EIS is required, an agency may first prepare an [EA]." *Id.*  An EA is a "concise public document," 40 C.F.R. § 1508.1(h) (2020),[2] that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant

---

[2] We cite to the 2020 version of NEPA's implementing regulations because that was the version in effect at the time BLM issued the challenged decision.  *See Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 980 n.3 (9th Cir. 2022) (explaining that the version effective at the time the ROD was issued governs our analysis).

impact." *Id.* § 1501.5(c)(1) (2020). "If, after preparing the [EA], an agency determines that the action 'will not have a significant effect on the human environment,'" the agency "need not prepare an EIS" and may instead issue a FONSI, which completes the NEPA process. *Montana Wildlife Fed'n*, 127 F.4th at 20 (citation omitted). BLM properly did so here.

**1**

As part of the EA, BLM was required to take a "hard look" at the Project's environmental consequences. Friends contends that BLM failed to do so because it (1) relied on the Project's concentrated animal feeding operation (CAFO) permit in its analysis, (2) did not fully consider the Project's impacts on soil and groundwater, and (3) did not fully consider the Project's impacts on the horses and burros housed at the ORC. For the reasons discussed below, we reject these arguments and conclude that BLM took the requisite "hard look."

**a**

Friends first argues that BLM used the CAFO permit to limit the scope of its NEPA analysis and avoid addressing the significance of the Project's impacts.

The United States Environmental Protection Agency regulates the discharge of pollutants from point sources to waters of the United States through its National Pollutant Discharge Elimination System (NPDES) permitting program. Under this program, a CAFO operator must obtain a NPDES permit, which sets forth requirements to prevent pollution of water sources from manure and wastewater. 40 C.F.R. § 122.23(a). Along with the CAFO permit, a large CAFO like the Winnemucca ORC must have a nutrient

management plan (NMP) to manage waste and prevent its discharge into waters of the United States. *Id.* § 122.42(e)(1). These permits require operators to take specific measures to prevent pollutant discharges, including ensuring "adequate storage of manure," *id.* § 122.42(e)(1)(i); "proper[ly] manag[ing] mortalities (i.e., dead animals)," *id.* § 122.42(e)(1)(ii); "ensur[ing] that clean water is diverted," *id.* § 122.42(e)(1)(iii); and preventing confined animals from directly contacting waters of the United States, *id.* § 122.42(e)(1)(iv).

In Nevada, CAFO permits are issued by the Nevada Division of Environmental Protection (NDEP). While the CAFO permit does not regulate discharges to groundwater, Nevada state law does. Thus, NDEP also requires the terms of a CAFO's NMP to include provisions ensuring compliance with state groundwater quality standards.

Accordingly, BLM required JS Livestock to obtain a CAFO permit and NMP as part of the Project's design features and as a condition of its approval. BLM explained that by requiring JS Livestock to obtain a CAFO permit and NMP, "[i]mpacts to surface and ground water, potential for nutrient release during flood events or creating nutrient plumes, would be negligible." BLM concluded that the CAFO permit, NMP, and other design features would reduce the risk of runoff and erosion, and ensure that all waste would be stored "in a manner that prevents wastes and sediment from entering surface water and seepage of nutrients into ground water." Thus, any impacts to groundwater or soil would be insignificant.

In *Robertson*, the Supreme Court concluded that a federal agency may condition project approval on obtaining certain state agency permits when that project's

environmental effects "cannot be mitigated unless nonfederal government agencies take appropriate action." 490 U.S. at 352–53 (explaining that in the context of a mitigation plan "it would be incongruous to conclude that the Forest Service has no power to act until the local agencies have reached a final conclusion on what mitigating measures they consider necessary"). The principles set forth in *Roberston* are instructive here. BLM imposed as a condition of approval a requirement that JS Livestock obtain a CAFO permit and NMP and then analyzed the Project's environmental impacts under the assumption that those permits would be in place. Consistent with *Robertson*, the EA's discussion addressed the environmental impacts and "discussed" the CAFO permit and NMP requirements "in sufficient detail to ensure that environmental consequences [were] fairly evaluated."[3] *Id.* at 352; *see also Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1015 (9th Cir. 2006) (upholding EA that "analyze[d] the Project under the enumerated constraints and conclude[d] that any environmental impacts [would] not be significant"). BLM's determination that the CAFO permit and NMP would alleviate the Project's impacts, particularly with respect to groundwater and soil, was reasonable.

Friends relies on *South Fork Band Council of Western Shoshone v. United States Department of the Interior* for the proposition that BLM neglected its NEPA obligations by relying on the CAFO permit. 588 F.3d 718 (9th Cir. 2009) (*South Fork*). In *South Fork*, BLM did not discuss the air quality impacts of transporting ore to an off-site processing

---

[3] For this reason, BLM also did not abuse its discretion by conditioning its approval on obtaining the CAFO permit, even though NDEP had not started drafting the CAFO permit. *See id.* at 352–53.

facility in its EIS for a mining project because the off-site facility operated "pursuant to a state permit under the Clean Air Act." *Id.* at 726. The court therefore held that BLM violated NEPA because "[a] non-NEPA document—let alone one prepared and adopted by a state government— cannot satisfy a federal agency's obligations under NEPA." *Id*. (citation omitted). But unlike BLM's omission in *South Fork*, here, BLM *did* evaluate the Project's environmental impacts. BLM then concluded that any impacts to soil and groundwater would be rendered insignificant, in part, through Nevada's CAFO and NMP permitting process and compliance with state water quality regulations.

Friends also contends that even if BLM could rely on the CAFO permit in its environmental analysis, the CAFO permit did not render the Project's impacts insignificant. The two cases Friends relies on for this argument are distinguishable.

In *Environmental Defense Center v. Bureau of Ocean Energy Management*, the agencies relied on a NPDES permit in their EA approving a project for offshore well stimulation treatments to conclude that any project impacts would be insignificant to the marine environment. 36 F.4th 850, 874 (9th Cir. 2022). The court concluded that the defendant agencies improperly relied on the NPDES permit because the testing the NPDES permit required was not intended for the treatments at issue and was inadequate to measure the impacts of well stimulation treatments. *Id.* at 874–75. The permit would have to be modified to adequately test those treatments, but because a different agency issued the permit, the defendant agencies had no power to do so. *Id.* at 875.

In contrast to the permit in *Environmental Defense Center*, the CAFO permit is designed to address the exact impacts of an animal operation like the Winnemucca ORC. As noted by the district court, "the fit between the permit and the regulated activity is" seamless "because the effluents of a horse corral are precisely the type of discharge the CAFO permit is designed to prevent." Further, no modification to the CAFO permit is required because, it is already "tailored to specifically address the exact type of animal facility at issue." Accordingly, *Environmental Defense Center* is not controlling.

Friends' reliance on *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission* is also misplaced. 449 F.2d 1109 (D.C. Cir. 1971). In that case, the Atomic Energy Commission had passed a rule prohibiting its board from "conducting an independent evaluation and balancing of certain environmental factors if other responsible agencies [had] already certified that their own environmental standards are satisfied." *Id.* at 1117. Here, BLM did not prohibit consideration of any environmental impacts; rather, it considered potential impacts and concluded that compliance with the CAFO permit would ensure that groundwater impacts would be negligible.

Accordingly, we see no abuse of discretion in BLM's reliance on the CAFO permit and NMP in considering its environmental impact analysis.

**b**

Overlapping with its CAFO permit argument, Friends next contends that BLM failed to take a "hard look" at the impact on groundwater and soil, and ignored evidence related to flooding.

As to groundwater, Friends asserts that BLM contradicted its own experts' findings that groundwater contamination is likely to occur due to the lack of mitigation measures for the area's high-water table. But the record reflects that BLM considered groundwater impacts and adequately responded to public comments regarding this issue. The EA determined that impacts to groundwater would be negligible with the CAFO permit and NMP in place. Further, an engineered drainage system would catch any runoff from the site. These features would prevent seepage of nutrients into groundwater.[4]

As to soil, Friends argues that BLM acknowledged the "poor soil composition" at the Project site but failed to provide any evidence that the Project's design features would adequately prevent impacts to the soil. But BLM required the Project to implement a dust prevention and control plan, establish a plan to manage soil drainage, and obtain a CAFO permit to reduce impacts to soil. Friends may disagree with BLM's conclusion, but the record shows that there is "a rational connection between the facts found and the choice[] made" by BLM in the EA. *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir. 2003)). Further, to the extent that Friends complains the requirements were not set forth in sufficient detail (i.e., BLM required adequate sloping to ensure runoff, but did not specify what degree the sloping needed to be), Friends in essence asks us to impose "a

---

[4] Although Friends claims that "BLM's own experts opposed BLM's reliance on the CAFO permit," the email cited is part of a thread in which a BLM employee was *confirming* that NDEP regulated groundwater quality.

substantive requirement that a complete mitigation plan be actually formulated and adopted" in BLM's NEPA evaluation. *Robertson*, 490 U.S. at 352. That is not what NEPA prescribes. *Id.*

Lastly, we agree with the district court that the record reflects BLM addressed potential impacts of flooding by both mandating compliance with the CAFO permit and recommending measures to prevent runoff in the event of a 100-year flood.

Accordingly, we conclude that BLM took the requisite "hard look" at the Project's impacts on groundwater and soil, and in doing so, it did not neglect to consider evidence of flooding.

**c**

Next, we consider whether BLM took a "hard look" at the Project's impacts on the wild horses and burros held at the facility. *See Am. Horse Prot. Ass'n, Inc. v. Andrus*, 608 F.2d 811, 814 (9th Cir. 1979) (noting there that "the environmental impact [was] not solely on the rangelands, but on the horses as well" and that "wild free-roaming horses . . . [are] 'an integral part of the natural system of the public land'" (quoting 16 U.S.C. § 1331)).

The EA does not have a separate section or conclusion explicitly stating that there would be no significant impact on the wild horses and burros housed at the Winnemucca ORC. But as discussed, BLM reasonably relied on the Standards and contract requirements to ensure humane treatment of the animals housed at the facility. And it concluded in the FONSI that the Project would not have any significant environmental impacts.

Friends nevertheless asserts that the EA is deficient because in response to public comments, BLM stated that impacts on wild horses and burros within the facility were "outside the scope" of the EA and that there were no wild horses or burros in the Project area. Relatedly, Friends contends that BLM improperly relied on unspecified EAs for gather-and-removal actions (gather EAs) to conclude there would be no significant impacts on the horses and burros at the Project facility. These arguments stem primarily from a BLM response to public comments, in which BLM stated:

> This comment is outside the scope of this EA. Impacts to individual animals are analyzed in site-specific EAs. There are several other ORC[s] throughout the west in similar settings/climates with the same or similar requirements. The conditions as a result of these requirements in these other facilities have shown to provide humane care for the animals. Regardless of where these WHBs are cared for, any WHB that is removed from public land will be cared for in a similar facility with the same or similar requirements as described in the [site-specific] EAs, therefore there is not a need to analyze the impacts to individual animals within this EA.

As clarified by BLM's counsel at oral argument, this comment explains that BLM analyzes the impacts of gathering, transporting, and holding individual animals (including at ORCs) in separate gather EAs. Thus, BLM concluded that because those impacts on animals are separately considered, and because the decision at hand related only to funding the contract for the Winnemucca

ORC, comments addressing the general impact of capture and captivity on animals were outside the scope of the EA.[5]

In isolation, BLM's response to the public comments could be concerning. But in the context of the entire EA, it is clear BLM did not ignore impacts on animals to be held at the facility. BLM analyzed and addressed humane treatment of the animals at the facility by requiring the contractor to adopt and comply with the Standards and other requirements to ensure animals are properly taken care of while housed at the Winnemucca ORC. Mindful of the lower standard for EAs, we conclude that BLM "reasonably explained its environmental assessment." *Citizens Action Coal. of Indiana, Inc. v. Fed. Energy Regul. Comm'n*, 125 F.4th 229, 242 (D.C. Cir. 2025) ("When presented with an arbitrary and capricious challenge, we must consider whether [the agency] reasonably explained its environmental assessment, not whether it used certain magic words.").

Likening this case to *Kern*, Friends also asserts that BLM's analysis of impacts on wild horses and burros violated NEPA because its reliance on the Standards constitutes impermissible tiering to a non-NEPA document. 284 F.3d 1062. In *Kern*, the plaintiffs alleged that BLM failed to adequately consider the impact of root fungus on a specific variety of cedar. *Id.* at 1066. The court held that BLM's EIS and EA were inadequate because it tiered its two-sentence analysis to a set of guidelines (for mitigating

---

[5] Counsel for Friends also confirmed at oral argument that Friends is not challenging the congressionally mandated capture and captivity of excess wild horses and burros as a general matter. *See Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1031 (9th Cir. 2020) ("[A] party cannot challenge an entire agency management regime under the auspices of the APA.").

damage caused by the root fungus) that had never been reviewed under NEPA. *Id.* at 1073–74.

In contrast to *Kern*, here, BLM did not tier its analysis to a non-NEPA document; instead, it incorporated the contract solicitation by reference into the EA, which incorporated the Standards as a contract requirement. This incorporation was not improper: "where an agency merely incorporates material 'by reference,' without impeding agency and public review of the action, the agency is not improperly tiering." *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1119 (9th Cir. 2018) (citation omitted).[6]

Finally, Friends argues that BLM did not consider how the Winnemucca ORC would specifically impact the animals, including the Project's soil conditions, size and capacity of the ORC, shelter, and disease transmission. As discussed above, however, BLM considered these issues and imposed the Standards and additional requirements to ensure any impact would be nonsignificant. "While [Friends] may disagree with the [EA's] substantive conclusion regarding . . . impacts [on horses], the [EA's] discussion of those impacts was reasonably thorough." *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 526 (9th Cir. 1994).

In sum, we are satisfied that BLM took the requisite "hard look" at the environmental consequences of the Project as required by NEPA.

---

[6] BLM's citation to site-specific gather EAs also does not appear to be an attempt to tier or rely on unspecified documents to analyze the Winnemucca ORC. Rather, BLM was clarifying the scope of its assessment and the federal action at issue.

**2**

Next, we turn to whether BLM conducted a reasonable analysis of project alternatives.

NEPA requires a federal agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(H). "[A]n agency's obligation to consider alternatives under an EA is a lesser one than under an EIS," and need only include a brief discussion of reasonable alternatives. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005).

"[T]he nature and scope of the proposed action" dictates the range of alternatives for consideration. *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995) (quoting *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 (9th Cir. 1992)). Thus, "[w]hether the range of alternatives considered is reasonable is to some degree circumscribed by the scope of the statement of 'purpose and need.'" *Env't Def. Ctr.*, 36 F.4th at 876 (quoting *Westlands Water Dist. v. U.S. Dept. of Interior*, 376 F.3d 853, 865 (9th Cir. 2004)). Accordingly, we "begin[] by determining whether or not the [EA's] Purpose and Need Statement was reasonable." *Westlands*, 376 F.3d at 865. If it is, then we employ a "rule of reason" analysis to determine whether the agency considered an adequate range of alternatives to the proposed action. *Id.* at 868 (citation omitted).

BLM set forth the following purpose and need statement for the Winnemucca ORC:

> The purpose of the Proposed Action is to construct, maintain, and operate an ORC facility through a BLM contract with the Contractor for a maximum of 4,000 excess WHB on 100 acres of private land near Winnemucca, Nevada. The need for the Proposed Action is to provide holding space necessary to safely and humanely care for excess WHB removed from public lands consistent with authority provided in Section 3 of the [Wild Horses Act].

Friends contends BLM drafted this statement too narrowly to avoid addressing reasonable project alternatives and thus preordained the outcome of the action. BLM responds that it properly tailored the purpose and need statement to the scope of the proposal under consideration.

BLM has the better argument. BLM has considerable discretion in tailoring the purpose and need of the Project. *See Env't Def. Ctr.*, 36 F.4th at 876 (explaining that "agencies enjoy a good deal of discretion in framing the purpose and need of an EA or EIS" (citation modified)). Further, when preparing the purpose and need statement, BLM must "consider the views of Congress" as expressed "in the agency's statutory authorization to act." *Nat'l Parks & Conservation Ass'n v. U.S. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2010) (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991)). The need to provide holding space for excess animals is consistent with Congress's directives in the Wild

Horses Act, including to "immediately remove excess animals from the range." 16 U.S.C. § 1333(b)(2). Thus, it does not appear unreasonable that BLM tailored the purpose and need statement to JS Livestock's specific proposal to contract for an ORC on private land.

Additionally, as the district court explained, the Project's purpose and need statement "does not lead to a preordained conclusion" because "BLM adequately considered the alternative of no action." *See League of Wilderness Defs.- Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1070 (9th Cir. 2012) (concluding that although some language "read in isolation" suggested that purpose and need statement contemplated implementation of study plan, the objectives were not too narrow when considered in context). Accordingly, we conclude that the purpose and need statement for the Winnemucca ORC was reasonable.

The next prong of the analysis is whether BLM considered an adequate number of alternatives given the Project's purpose and need. Here, BLM considered two alternatives in its EA: funding the Winnemucca ORC and taking no action.

We note at the outset that we have previously upheld EAs that considered just two final alternatives. *See, e.g.*, *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 916 (9th Cir. 2012) (upholding EA where agency initially considered multiple alternatives, but ultimately considered only two of those alternatives in detail); *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1012 (9th Cir. 2012) (upholding EA that considered the preferred alternative and no-action alternative in detail and only briefly considered another alternative proposed by the plaintiff); *N. Idaho Cmty. Action*

*Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (upholding EA that only discussed two alternatives); *Native Ecosystems Council*, 428 F.3d at 1245 (upholding EA that considered six alternatives, four of which were rejected without detail).

Friends nevertheless maintains that BLM's analysis of two alternatives was insufficient because it failed to consider other alternatives, including (1) contracting with a long-term ORP, (2) establishing a "BLM-owned and managed" ORC, (3) reducing the number of removed horses and burros from the range, and (4) imposing conditions that would make the Winnemucca ORC safer and more humane.   But the Project's purpose is to provide more ORC capacity, not to reevaluate the system of management of wild horses and burros.   Accordingly, Friends' suggested alternatives to reduce the number of horses removed from the range and to contract with a long-term ORP are beyond the scope of the action.  *See Oregon Nat. Desert Ass'n*, 957 F.3d at 1031. Creating a "BLM-owned and managed" ORC also falls outside the scope of the specific action proposed by JS Livestock.

Friends' assertion that BLM failed to consider an alternative version of the contract with different terms related to the conditions for the animals is also unavailing for at least two reasons.  First, although Friends asserts that the public proposed this as a Project alternative, the comment cited appears to be an attack on the standards of care adopted by BLM—not a true proposal for a Project alternative.  Because Friends does not direct us to any record citations containing this argument, we deem it unexhausted and do not consider it.  *See Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1064–65 (9th Cir. 2023) ("Because [the plaintiff] failed to raise its proposed alternatives during the

comment period, it failed to exhaust its argument, and we need not reach the merits of the suggested alternatives.") Second, and in any event, "it makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined, through its decision not to file an impact statement, will have no significant environmental effects anyway." *Id.* at 1066 (quoting *Earth Island Inst.*, 697 F.3d at 1023); *see also Headwaters, Inc. v. U.S. Bureau of Land Mgmt.*, 914 F.2d 1174, 1181 (9th Cir. 1990) (explaining that "NEPA does not require a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences").

As a final issue, Friends says that BLM did not address the "no-action" alternative in "sufficient detail." We disagree. The EA explains that under the no-action alternative, the Project site would not be impacted because there would be no change to the local environment due to any federal action. The EA addresses the no-action alternative with respect to soil, raptors and migratory birds, terrestrial wildlife, and social and economic conditions. BLM concluded that the no-action alternative would result in BLM not funding the contract and that "[i]t would be speculative to assume how the Contractor would use the existing agriculture land." Such a statement was not unreasonable: "NEPA does not demand a full discussion of land use alternatives whose implementation is deemed remote and speculative." *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 988 (9th Cir. 1985) (citation modified).

Accordingly, we conclude that BLM's "consideration of a 'no action' alternative and its 'preferred' alternative met its

statutory and regulatory duty to prepare appropriate alternatives for the [] Project EA." *Native Ecosystems Council*, 428 F.3d at 1249.

**3**

Friends' final challenge under NEPA is to BLM's decision to issue a FONSI. Friends contends that BLM failed to provide a convincing statement that the Project's impacts would be insignificant and that it instead should have moved forward with preparation of an EIS.

NEPA requires BLM to prepare an EIS if the Project will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(C). That requirement can be triggered if "substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (citation modified). Agencies determine significance by "analyz[ing] the potentially affected environment and the degree of the effects of the action." 40 C.F.R. § 1501.3(b) (2020). When considering the degree of the effects, agencies look at "short-and long-term effects," "beneficial and adverse effects," "[e]ffects on public health and safety," and "[e]ffects that would violate Federal, State, Tribal, or local laws protecting the environment." *Id.* § 1501.3(b)(2) (2020).

BLM addressed the above factors in its FONSI and concluded that the proposed action would not cause significant environmental impacts. It also incorporated the EA by reference into the FONSI analysis. It described the potentially affected environment, including the affected area and its resources, like migratory bird species. It considered that while there would be short-term impacts during construction, such as impacts to air quality, soil, and noise,

those impacts would dissipate once construction ended. It found that the long-term benefits of providing a safe, sanitary holding facility for wild horses and burros would outweigh any short-term effects. It addressed both beneficial and adverse impacts and confirmed that no concerns or known instances were identified where public health or safety would be affected. It also concluded that the action would comply with applicable federal, state, and local laws.

Friends argues that BLM erred in reaching its conclusion of no significant impact because it relied on "hypothetical mitigation measures" and that mitigated FONSIs are subject to additional requirements with respect to analysis of mitigation measures. *See* 40 C.F.R. § 1501.6(c) (2020); 43 C.F.R. § 46.130(b) (2008). But BLM did not impose after-the-fact mitigation measures; rather, it required the contractor to comply with several requirements, like the Standards and obtaining a CAFO permit, as mandatory components of the contract. By incorporating those measures "throughout the plan of action . . . the effects [were] analyzed with those measures in place." *Env't Prot. Info. Ctr.*, 451 F.3d at 1015. Accordingly, "it cannot be said that the EA fails to analyze the effects of the mitigation measures; instead, the EA analyzes the Project under the enumerated constraints and concludes that any environmental impacts will not be significant." *Id.* And to the extent Friends complains that the EA's discussion of these design features is too short, we are mindful that an EA is intended to be a "concise public document," 40 C.F.R. § 1508.1(h) (2020), "*[b]riefly* providing sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact." *Id.* § 1501.5(c)(1) (2020) (emphasis added).

Friends also argues that BLM provided no scientific analysis or evidence in support of its determination that the Project would not cause significant impacts. In doing so, Friends reiterates the same arguments we have rejected above regarding the insufficiency of the CAFO permit and impacts to soil, groundwater, and the animals.

We conclude that BLM provided a "convincing statement of reasons to explain why the Project's impacts are insignificant." *See Blue Mountains Biodiversity Project*, 161 F.3d at 1212 (citation modified). Therefore, BLM did not violate NEPA when it decided not to issue an EIS.

\* \* \*

We conclude that BLM did not abuse its discretion or act contrary to law when it approved funding for the Winnemucca ORC contract. In reaching this determination, we hold that BLM (1) did not violate the Wild Horses Act's mandate to ensure humane treatment of wild horses and burros; (2) reasonably relied on contractor compliance with the CAFO permit in its environmental impact analysis; (3) took a "hard look" at the Project's impacts to groundwater, soil, and animals housed at the facility; (4) did not abuse its discretion by considering only two alternatives; and (5) provided a convincing statement of reasons why the Project's environmental effects would not be significant. The district court thus properly granted summary judgment to BLM, and it likewise properly denied Friends' motion for summary judgment.

**AFFIRMED**.